**MANCHESTER MUSIC COMPANY, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 88–257–D.**

United States District Court, D. New Hampshire.

Feb. 28, 1990.

---

Mark F. Weaver, Manchester, N.H., for plaintiff.

Merrell B. Green, Tax Div., Dept. of Justice, Washington, D.C., and Gretchen Leah Witt, Asst. U.S. Atty., Concord, N.H., for defendant.

## OPINION AND ORDER

PEREZ–GIMENEZ, Chief Judge, Sitting by Designation.

Section 6041(a) of the Internal Revenue Code of 1954, as amended in 1982, requires all persons who in the course of their trade or business make payments in excess of $600.00 a year [1] to file information returns reporting the name and address of its recipient and the amount paid. Its legislative history indicates that it was intended to inform the I.R.S. that specified items have been disbursed by the payor so that the Service could determine whether the recipient had treated them properly for tax purposes.[2] Section 6652, on the other hand, provides that if a taxpayer fails to file the information returns required by § 6041(a) "due to [an] intentional disregard of the filing requirement," then a penalty of ten percent of the aggregate amount of the items required to be reported will be imposed by the government.[3] This case turns

---

1. The section applies to payments other than those with respect to which independent statements are required under the authority of other provisions listed in that section.

2. *See* Background on Federal Income Tax Compliance Act and Description of S. 2198 (Taxpayer Compliance Improvement Act of 1982) p. 13.

3. Treasury Regulations 1.6041–1 and 1.6041–6 provide that the information returns shall be filed on or before February 28 of the following calendar year. In the case at bar, the returns for the year 1982 were not filed until December of 1985 and those for the year 1983 until February of 1985. This, of course, was done after a number of meetings between officials from

on the propriety (or lack thereof) of the Internal Revenue Service's decision to assess penalties against the plaintiff for failure to file information returns and for intentional disregard of information filing requirements for the tax years 1982 and 1983.[4]

It was on June 22 of 1988 that the plaintiff, Manchester Music Company, commenced the instant action against the United States of America to receive a refund for this alleged wrongful assessment of civil penalties by the I.R.S. After some preliminary skirmishing, the matter was tried to the Court, sitting jury-waived, in early October of 1989. Following that two-day bench trial, decision was reserved. What follows constitutes this Court's findings of fact and conclusions of law as mandated by Fed.R.Civ.P. 52(a).

## Findings of Fact

1. Manchester Music Company, Inc., is a corporation that owns coin-operated amusement devices, including video games, pin ball machines, and juke boxes.

2. Manchester Music at all times relevant to this suit, was owned by members of the Taube family, including Irving Taube.

3. The owners of Manchester Music also were the partial or complete owners of three related corporations, Taube Finance Company, Inc., Taube Investment Corporation and Taube Realty Corporation.

4. By letter dated April 20, 1983, Valerie Garvey, on behalf of the Internal Revenue Service, notified Manchester Music that she would conduct an audit of the corporation and she requested that Manchester Music make available to her extensive records regarding its business.

5. On May 5, 1983, Valerie Garvey began her audit of Manchester Music by speaking with Irving Taube and Paul O'Leary, one of Manchester Music's accountants from Coopers & Lybrand.

6. At that time, Ms. Garvey did not raise any questions or make any reference to the filing of form 1099s by Manchester Music.

7. During the course of the audit, Manchester Music provided Ms. Garvey with the documents requested in her letter of April 20, 1983, as well as with any additional documents she requested.

8. By late May 1983, Ms. Garvey began looking into certain issues concerning telephone bills and auto costs that had been charged to Manchester Music that she felt related to individual rather than business use.

9. On December 28, 1983, Ms. Garvey met with Irving Taube and Manchester Music's accountants, David Skiff and Paul O'Leary, to discuss the completion of her audit of Manchester Music.

10. The subject matter of the December 28, 1983, meeting was to discuss the individual use issues of car expenses and telephone bills charged to Manchester Music.

11. The issue of form 1099s was not discussed at that meeting.

12. Prior to mid-April 1984, Ms. Garvey did not discuss the issue of the filing of form 1099s with anyone from or representing Manchester Music.

13. The first entry in Ms. Garvey's activity record from the work papers of the Internal Revenue Service's 1099 file for Manchester Music regarding 1099s was on May 22, 1984.

14. That activity record in the 1099 file began as a photocopy of the original activity record kept in the work papers of the Internal Revenue Service's 1120 audit file for Manchester Music.

15. The activity record of Ms. Garvey from the work papers of the 1120 file for Manchester Music shows an entry for December 28, 1983, referencing a conversation with a representative of Manchester Music regarding 1099s.

Manchester Music and from the I.R.S. in which the matter was extensively discussed and then only under protest.

**4.** The penalties for the tax years in controversy were respectively assessed on the days of August 5 and 12 of 1985.

16. Ms. Garvey states that the December 28, 1983, entry refers to a telephone conversation with David Skiff.

17. The reference to the 1099s contained in the December 28, 1983, entry of the 1120 file does not appear in the work papers of the 1099 file, which were photocopied from the same records.

18. Therefore, the examining officer's activity record of Valerie Garvey from Manchester Music's 1120 work papers was altered to add a reference to a purported conversation with a representative from Manchester Music concerning 1099s on December 28, 1983.

19. No conversation by telephone or otherwise regarding form 1099s took place between David Skiff, or any representative of Manchester Music, and Valerie Garvey on December 28, 1983, nor at any other time before April 1984.

20. On or about February 17, 1984, Irving Taube read an article in *Play Meter* magazine indicating that the Internal Revenue Service was participating in a nationwide crackdown concerning the filing of form 1099s in the video game industry.

21. February 17, 1984, was the first time that Mr. Taube had any knowledge that the Internal Revenue Service had a position regarding the filing of form 1099s for coin-operated amusement machine operators.

22. Prior to reading the February 15, 1984, *Play Meter* article, Mr. Taube was not aware of any alleged requirement or position that Manchester Music might need to file forms 1099 regarding its amusement machine business.

23. On or about February 17, 1984, Mr. Taube contacted Mike Spector, his accountant at Coopers & Lybrand and met with him on or about February 17, 1984, to ask if Manchester Music should be filing 1099s regarding the monies divided between the corporation and the proprietors of the locations of its machines.

24. At that time, Mr. Spector advised Mr. Taube that Manchester Music did not need to file form 1099s for the monies divided between the corporation and the proprietors of the establishments where its amusement devices were located.

25. In early April 1984 Irving Taube read another article in the April 1, 1984 issue of *Play Meter* magazine regarding the filing of form 1099s which supported Manchester Music's position.

26. During early April 1984 Valerie Garvey was auditing the books of the corporations related to Manchester Music.

27. During this audit, Ms. Garvey asked Irving Taube if Manchester Music filed form 1099s regarding the monies divided between Manchester Music and the proprietors.

28. Mr. Taube told Ms. Garvey that the corporation did not file 1099s because it did not believe it had to and he provided her with a copy of the article dated April 1, 1984 from *Play Meter* magazine.

29. At that time, Ms. Garvey indicated that she agreed with Mr. Taube that Manchester Music need not file 1099s for the division of revenues with the proprietors.

30. Mr. Taube contacted David Skiff about the article and Ms. Garvey's statements and asked if Manchester Music should file form 1099s.

31. This was the first time Mr. Skiff was aware that the service might have a position regarding the filing of form 1099s for coin-operated amusement devices.

32. Mr. Skiff had worked on Manchester Music's taxes since 1981 and was familiar with the terms of the agreements between Manchester Music and the proprietors and had never advised Manchester Music to file form 1099s regarding the division of revenue.

33. After Mr. Taube's inquiry in early April, Mr. Skiff researched the issue and discovered Revenue Ruling 57–7 and several Tax Court decisions relating to this issue.

34. Mr. Skiff advised Manchester Music that based on his research regarding Revenue Ruling 57–7 and several Tax Court decisions, Manchester Music did not have to file form 1099s regarding its agreements

with the proprietors of the premises where its machines were located.

35. Ms. Garvey subsequently told Mr. Taube that her supervisor had indicated that 1099s should be filed for the division of revenues from the machines.

36. Ms. Garvey subsequently contacted David Skiff, in approximately mid-April 1984, and asked why Manchester Music was not filing form 1099s regarding the division of monies from its machines.

37. Mr. Skiff told her that Manchester Music did not have to file form 1099s because the division of revenues did not fit under 26 U.S.C. section 6041(a) as a payment requiring the filing of a form 1099.

38. Mr. Skiff also discussed the applicability of Revenue Ruling 57–7 and several Tax Court decisions with Ms. Garvey.

39. Ms. Garvey called Mr. Skiff several weeks later and told him that the forms 1099 should be filed.

40. On September 10, 1984, after several more discussions with Ms. Garvey, Mr. Skiff requested technical advice from the Internal Revenue Service regarding the asserted requirement for Manchester Music Company, Inc., to file form 1099s.

41. By letter dated October 4, 1984, Valerie Garvey indicated that the Internal Revenue Service was denying Mr. Skiff's request for technical advice.

42. That request was denied by Ms. Garvey's supervisor, who refused to send the technical advice request to Washington for a ruling by the Internal Revenue Service.

43. In October 1984, Ms. Garvey told Mr. Skiff that Manchester Music would have to file the form 1099s or she would file them.

44. By letter dated December 18, 1984, the 1099 forms for 1982 were filed with the Internal Revenue Service.

45. The form 1099s for 1983 was filed by letter dated February 1, 1985.

46. By notice dated August 5, 1985, the Internal Revenue Service notified Manchester Music of a penalty charge in the amount of $132,573.00 regarding tax year ending December 31, 1982.

47. By notice dated August 12, 1985, the Internal Revenue Service assessed a penalty against Manchester Music in the amount of $98,223.60 for the tax year ending December 31, 1983.

48. Within ten days from the date of those notices, David Skiff, on behalf of Manchester Music, sent a response to the Internal Revenue Service replying to the penalties and arguing that they did not apply and should not be assessed against Manchester Music.

49. After several conferences in the Spring of 1986 between Manchester Music's representatives and Thomas D. Leary, III, an appeals officer with the Internal Revenue Service, Mr. Leary denied the appeal of Manchester Music on September 29, 1986.

50. That disposition of the case by Thomas Leary was approved on October 16, 1986.

51. By notice dated November 17, 1986, the Internal Revenue Service issued a past-due final notice regarding the penalties assessed for intentional disregard of section 6041(a) of the Internal Revenue Code in the amounts of $132,573.00 for the tax year ending September 31, 1982, and $98,223.60 for tax year ending December 31, 1983.

52. On January 27, 1987, Manchester Music made payment under protest of $340.41 regarding the Belmont House of Pizza for tax year 1983, $79.15 regarding the Quick Clean Laundry for tax year 1983, $70.01 regarding the Bartlett Street Laundromat for tax year ending 1982, and $306.20 for Sabo's Sandwich Shop for tax year ending 1982.

53. On January 27, 1987, Manchester Music also filed forms 843 seeking a refund of the amounts paid for each of the four locations.

54. On May 7, 1987, the Internal Revenue Service mailed to Manchester Music a Notice of Disallowance of the claims for refund filed on January 27, 1987.

55. This lawsuit was filed on June 22, 1988, seeking a refund of the amounts paid on January 27, 1987.

56. Manchester Music has both oral and written agreements with the proprietors of various establishments regarding amusement machines owned by Manchester Music, including written agreements with Sabo's Sandwich Shop and the Belmont House of Pizza, and oral agreements with the Quick Clean Laundry and Bartlett Street Laundromat.

57. In those agreements, Manchester Music agreed to furnish and install on the proprietor's premises certain amusement devices, including video games, pin ball machines and juke boxes.

58. The machines installed by Manchester Music were selected by agreement between both parties, sometimes by recommendation of Manchester Music and sometimes by recommendation of the proprietor.

59. Under the agreements, Manchester Music agreed to service and repair the amusement devices.

60. Under the written agreements, the proprietor agreed to exclusively use the amusement machines of Manchester Music.

61. Manchester Music and the proprietor agreed to divide equally all receipts resulting from the operation of the machines.

62. The parties also agreed that they would each pay one-half of the amount of any federal, state or municipal taxes, license fees or any other levies occurring because of the operation of the machines.

63. The agreement also provided that the proprietor granted a security interest to Manchester Music in its property to secure the performance of the proprietor under the agreement.

64. Manchester Music had a coin vending machine agreement with the Belmont House of Pizza, identified as Plaintiff's Exhibit 11 at trial.

65. Manchester Music had a coin vending machine agreement with Rowena Varl d/b/a Sabo's Sandwich Shop, identified as Plaintiff's Exhibit 12 at trial.

66. Manchester Music had an oral agreement with the Bartlett Street Laundromat containing the same terms as set forth in Exhibits 11 and 12.

67. Manchester Music had an oral agreement with the Quick Clean Laundry also containing the same terms as set forth in Plaintiff's Exhibits 11 and 12.

68. Manchester Music held the key to the machines placed on the proprietor's premises.

69. Manchester Music did not have the keys to the premises where its machines were located.

70. Manchester Music employed collectors whose job it was to go into the proprietor's premises at a mutually agreed time and open the machines so that the monies in the machines could be divided between the parties.

71. If a proprietor requested that the monies be divided at some time other than at the scheduled time, a collector would go to the premises at the proprietor's request so the monies could be divided according to the agreement.

72. When the machine was opened, the collector would remove the money from the machine and the proprietor would be reimbursed for any quarters that were lost in the machine by customers and replaced by the proprietor.

73. The monies used to reimburse the proprietor came directly from the monies in the machine.

74. The monies in the machine were also used to reimburse the proprietor for the cost of licenses and taxes or permits paid on the machines.

75. The remaining monies in the machine were then divided equally between the parties, with each party taking its money from the money in the machine at that time.

76. Manchester Music and the proprietors, as set forth in their agreements, equally split the costs of taxes and license fees by reimbursing the owner from monies taken directly from the machine and divided equally all monies in the machines

after the reimbursements for taxes and fees.

77. Manchester Music has less than two dozen employees.

78. Manchester Music has a net worth of less than $7,000,000.00.

### Conclusions of Law

■ Against this backdrop, the government submits that under § 6041(a) the agreements linking Manchester Music with the various proprietors required the former to file forms 1099 for monies earned by the latters from the amusement machines that on their premises had been placed. A quick overview of § 6041(a) reveals that the allegation is predicated on a conclusion from this Court to the effect that the division of monies that took place at the proprietors' premises constituted "payments" by the plaintiff to the owners of the establishments, it being clear that without a "payment" no § 6041(a) reporting need take place. Realizing this, Manchester Music polemizes mightily against a conclusion along that line. Were we to conclude that they were, however, the government would further submit, and the plaintiff would conversely further dispute, that Manchester Music's failure to file the information returns was not based on reasonable cause but instead was due to an intentional disregard or a willful neglect of its filing duties within the meaning of § 6652. This being so, the argument goes, the tax additions that the Service had assessed should be allowed to stand.

The threshold issue presented by the record in this case and, as matters turn out, the sole one, is, then, whether Manchester Music made payments to the owners of the various establishments within the meaning of 26 U.S.C. § 6041(a). We hold, that under the terms of their agreements the division of proceeds from amusement machines between Manchester Music and the establishments' owners cannot be considered "payments" for purposes of § 6041(a), a conclusion which carries the further holding that the plaintiff had therefore no duty to submit information returns. This being so, its decision not to file them can have no adverse consequences from a legal point of view and we consequently find no occasion to decide whether it was based on reasonable cause. The reasoning supporting our decision ensues.

At the outset, we observe that we may take either of two independent roads in our quest to answer the above stated question. First, we can focus on the terms of the legal definition of "payment" and determine whether plaintiff's actions fall within its narrow contours. There being no barbed-wire fences delineating the boundaries of the legal definition of "payment," however, the task could prove to be tougher than it actually looks. On the other hand, we note that to be able to conclude that the division of proceeds constituted payments by the plaintiff to the various establishment owners we would first have to determine that the monies recovered from the machines constituted income to Manchester Music in their entirety. Put another way, only if both halves of the proceeds from the machines were to be considered money earned solely by the plaintiff could it then be seriously argued that the "transfer" of one half of the money from the plaintiff's hands to the proprietors' pockets constituted a "payment" for, say, rent for the space where the machines had been located.[5] Accordingly, we could also focus our attention on whether the machine proceeds originally belonged to the plaintiff in their entirety, whether they constituted income to them, a question which, were we to answer in the negative, would also bring our inquiry to a close. As we have hinted above, however, both paths lead to the same conclusion. To borrow an oft-used phrase, in this case, and with respect to the precise question presented for our consideration, "all roads lead to Rome."[6] In the interest of thoroughness,

---

5. This is so, on our view of things, regardless of the way we define payment for tax purposes, an issue which we address briefly in Part B.

6. *Kwatcher v. Massachusetts Service Employees Pension Fund*, 879 F.2d 957, 963 (1st Cir.1989), *Robertson Oil Co., Inc. v. Phillips Petroleum Co.*, 871 F.2d 1368, 1376 (8th Cir.1989).

however, we will address the issue from both standpoints, commencing our analysis with the latter point of view.

## A

Several opinions of the Tax Courts throw some light on what constitutes income for federal tax purposes. Of uncanny resemblance to the facts of this case is the 1945 decision in *Horace Mill v. Commissioner*, 5 T.C. 691 which the parties to this suit have argued at length. There, the petitioner was the owner of a number of slot machines that were placed in the club rooms of several fraternal groups in the State of Ohio. In exchange for allowing the slot machines in the lodges of one of the groups it was agreed that the fraternity would receive 80% of the "take" from the machines and that the remaining 20% would stay in the hands of the petitioner. Subsequently, it was further agreed that 5% of the fraternity's 80% share would be paid directly to the state organization which the group was a member of in lieu of its annual quota assessments. The petitioner would visit the lodges approximately once a week and, in the presence of some official from the lodge, would open the slot machines, count the money, and make out a collection slip which both parties would sign. The local lodge officials would then retain their 75% share and the petitioner would take the balance, keeping its 20% and sending a check to the state association representing the 5% which was due them. The issue presented before the Tax Court was whether the owner of the machines realized income from the 5% of the slot machine proceeds which he took possession of and sent to the state association. In holding that the 5% share was not income to the petitioner, the *Horace Mill* Court stated that "[t]he most practical view of the situation, perhaps, is that petitioner and the individual lodges and the state association all participated in the slot machine business and divided the 'take' among themselves."

A case not involving slot machines but dealing with the issue of whether money to be divided between two parties is at all income to one of the parties followed the same rationale. In *Stevens Brothers and Miller–Hutchinson Co. v. Commissioner*, 24 T.C. 953 (1955) the Court was called to decide whether a contractor could be taxed for the entire profits resulting from a construction job wherein an agreement had been made pursuant to which a third party would furnish the funds required to perform the job in exchange for one-half of the profits from the job. The Court found that in view of the fact that the third party corporation "was entitled to one-half of the income from the job, regardless of what the relationship between it and the petitioner may be called, ... that part of the income was not taxable to the petitioner."

A couple of additional cases, though ultimately finding for the Government, nevertheless utilized similar reasoning and therefore will serve to reinforce our point. In *Clark v. Commissioner*, 19 T.C. 48 (1952) the Court had to determine whether payments made by a taxpayer to a municipality to allow the illegal operation of the taxpayers's slot machines would be excludable from the taxpayer's gross income. The taxpayer had an agreement with the city according to which it could operate otherwise illegal slot machines if he made a monthly payment of $25.00 per machine. Some of the machines were maintained in the petitioner's cafe, others were installed in other establishments. The agreement did not call for the $25.00 to be paid from any particular source, although it was conceded that the petitioner did pay the money from the slot machines. As to the machines that were located in his establishments, petitioner paid the city $25.00 and received the total proceeds from these machines; as to the others, he paid the city $12.50 for permission to operate each machine in another place of business, required the proprietors to pay half the amount due the city, and then divided the remainder equally with them. In holding that the payments at issue were not excludable from the taxpayer's gross income, the Court went out of its way to let the fact be known that the distinguishing factor between the case before it and previous cases of a similar vein was that in that case there

was no participation between two or more parties "upon a joint basis in the undertaking." The city did not receive any benefit exclusive of the $25.00 monthly payment, the fee was dependent solely upon the number of machines in operation, and the amount or lack of profit made was of no consequence. Under these circumstances, the $25.00 monthly payment which was extracted from the proceeds of the machines was not income directly attributable to the city but was instead income to the petitioner, the city acquiring a title to it only after the payment had been made.

Finally, in *Diamond v. Commissioner*, 56 T.C. 530 (1971), after the petitioner, a mortgage broker, had claimed a deduction as a business expense for an item which he had originally described in his tax form as a "Consultant Fee," he switched horses in midstream and attempted to exclude from his income this portion of the total amount of commissions or fees he obtained in the conduct of his business claiming that he was a mere conduit for a third party who ultimately received the payment. In rejecting petitioner's contention, the Court first paused to make an observation of particular significance for our treatment of this case, as it stated that it "accepted as sound law the rule that a taxpayer need not treat as income moneys which he did not receive under a claim of right, which were not his to keep, and which he was required to transmit to someone else as a mere conduit." This fact notwithstanding, however, the Court ultimately concluded that under the facts that had been presented to it the taxpayer had received the payments in controversy not as a mere conduit but under a claim of right, and, therefore, it could but conclude that the amounts had to be considered part of his gross annual income.

The above cases recognize that situations exist where receipts or fees are split according to a contractual arrangement between the parties. In those situations, the receipts are only included as income of either of the recipients to the extent that they actually receive and control the funds pursuant to their contractual rights to the monies. On the one hand, an agreement can exist where one party is entitled to the totality of the proceeds from a given venture and merely has a contractual obligation to remit a sum of money to another. Typically, and naturally, that sum need not necessarily proceed from the very profits of the venture. In such cases, the receiving party acquires an entitlement to the money only after the "transfer" has taken place and thus it can properly be said that a payment occurs. On the other hand, where two or more parties embark in a joint venture, sharing in the profits as well as the losses, all of them receive the monies under a claim of right. Each party has an entitlement to them from the moment the monies commence to pile in even though it will not be possible to ascertain the amount until the time at which the division takes place. In such cases, each half (or percentage) of the money belongs, as a matter of right, to the corresponding party, and one of the parties acts as a mere conduit of the funds for the other. No payment of the funds occurs since they were merely "transferred" as a result of a contractual agreement between themselves.

Such is the case here. Manchester Music entered into agreements with the owners of several establishments whereby it agreed to install mutually selected amusement devices in the proprietors' premises in exchange for the owners' agreements to exclusively use the plaintiff's machines. Both parties were to share the profits, or losses, by one half, and any expenses for the use of the machines were to be equally divided between the two. Although Manchester Music held the keys to the machines, the keys to the establishments were in the sole possession of their owners and thus the division of proceeds could only take place at a mutually accorded time with representatives from both parties present for the count. Expenses would first be covered, each party absorbing one half of the cost, and the surplus money would then be divided between themselves. The arrangements were, in essence, independent joint ventures in which the parties shared the profit and the expense. As every quarter was put into a machine each party had

a contractual right, after costs and expenses had been covered, to claim an income of twelve and a half cents. As with the factual situation confronted by the *Horace Mill* court, the most practical view of the situation, undoubtedly, is that the petitioner and the individual establishments all participated in the slot machine business and divided the "take" among themselves. This being so, only the half of the proceeds to which petitioner had a right pursuant to the existing agreements can be considered income to him and the "transfer" of the other half to the owners of the establishments cannot constitute a payment for purposes of § 6041(a).

### B

Turning now, as we promised we would, to the legal definition of the term "payment" itself, we are reminded that even though " 'payment' is not a talismanic word ... [i]t may have many meanings depending on the sense and the context in which it is used." *U.S. v. Consolidated Edison Co.*, 366 U.S. 380, 391, 81 S.Ct. 1326, 1332, 6 L.Ed.2d 356 (1961). This is particularly true in the tax milieu, where technical definitions and fine distinctions abound. Mindful of this reality, the parties have offered some help in the form of bits and pieces from the federal tax laws and regulations. We accept their offerings unhesitantly.

Tax decisions have generally held that a "payment does not occur unless the money passes from the debtor to the creditor for the purpose of extinguishing the debt, and the creditor must receive it for the same purpose." *Ingalls v. United States*, 272 F.Supp. 10, 15 (N.D.Ala.1967). *See also Bailey v. Commissioner*, 103 F.2d 448 (5th Cir.1939), *Budge v. Post*, 544 F.Supp. 370 (N.D.Tex.1982). Of course, this definition raises the further question of what constitutes a "debt" for tax purposes, so it is source of scant solace. Looking to the tax statutes themselves, we observe that although the Internal Revenue Code does not define "payment" under § 6041(a), regulations promulgated pursuant to it offer some welcomed relief. According to Reg. § 1.6041–(f), a payment is deemed made when control over the amount at issue is

vested in the payee. This "control" aspect of the definition is echoed by commentators discussing what constitutes "payment" under the Internal Revenue Code, as it has been said that income is considered to be paid and received when it is "reduced to the taxpayer's possession, dominion, or disposition." *Fed.Tax.Coord.2d* G–2305 (1989). Leaving no stone unturned, we note that Black's Law Dictionary defines "payment" as, among other things, "a delivery of money or its equivalent ... by one person from whom it is due to another person to whom it is due." *Black's Law Dictionary* 1016 (5th ed. 1979). In sum, we believe we fairly state the point when we say that a payment occurs with the transfer of possession, dominion, or control over money or its equivalent from a person who up to that point had been exercising such prerogatives over the same to another who is due the funds.

Viewed in this light, we must conclude that the arrangements between Manchester Music and the various establishments did not require the plaintiff to make payments of any kind to the establishment owners. The reason is simple: at no point in time did Manchester Music ever exercise "possession, dominion, or control" over the funds which ultimately wounded up in proprietors' hands. The funds remained in the machine until the time when they were counted and divided. Although the plaintiff retained the keys to the machine, the proprietors held the keys to the establishments, so that neither could have access to the monies without the consent of the other. At the time when they were counted, representatives from both parties had to be present and in agreement with the division. Thus, no possession or control of the funds could occur until the monies were divided, and at that time each party assumed possession of the half to which they were entitled to. Transfer of possession, dominion, or control lacking, we hold, on this alternate ground too, that no payment occurred for purposes of § 6041(a).

### C

Before parting, defendant's flagship argument deserves to be addressed. It relies

exclusively on the Service's Revenue Ruling 57-7, which, for illustrative purposes, we have reproduced in the margin.[7] Their confidence is not unfounded, however, as in it the Service was faced with a virtually identical factual scenario and ruled that those arrangements constituted leases of space whereby the owner of the establishments "leased" to the owner of the machines the space occupied by said machines in their premises. The money from the devices that was "paid" by the machine owner to the establishment owner thus constituted "rent" for the use of the aforementioned space, and if in one year it exceeded the threshold amount of $600.00 the reporting mechanisms of § 6041(a) would be activated. This seemingly unsurmountable obstacle, however, no matter how ably presented, proves to be nothing more than a quotidian inconvenience in a competent lawyer's day.

■ Of course, "[r]evenue rulings issued by the I.R.S. are entitled to great deference," *Amato v. Western Union Intern., Inc.*, 773 F.2d 1402, 1411 (2d Cir.1985), because they "express the studied view of the agency whose duty it is to carry out the statute." *Anselmo v. C.I.R.*, 757 F.2d 1208, n. 5 (11th Cir.1985). Be that as it may, however, it is also well settled that "a revenue ruling is not entitled to the deference accorded to a treasury regulation or a statute" and that it can and should be disregarded by the court if unreasonable in any way. *Brook, Inc. v. C.I.R.*, 799 F.2d 833, n. 4 (2nd Cir.1986), *Threlkeld v. C.I.R.*, 848 F.2d 81, 84 (6th Cir.1988). Even though revenue rulings are not characterized by extensive discussions on the legal reasoning underlying their outcome, the ruling at issue particularly strikes as nothing more than a mere inclination of the spirit. What is more, we are of the opinion that the result it reaches is not only unreasonable but fatally flawed. We elaborate on our holding but briefly.

Whatever the reasoning underlying the Service's position to the effect that the arrangements at issue constituted leases of space for the operation of the amusement machines (which we do not know and therefore have no opportunity to evaluate), we are of the opinion the same reasons would support a similar conclusion to the effect that these arrangements could constitute leases of machines for placement at the proprietors' premises for profits. Hence, there is no reason why the Service could not conversely require the proprietors, instead of the machine owners, to file information returns with respect to the "payments" made to the owners of the devices for the operation of these machines. In

---

7. 1957-1 C.B. 435; Rev.Rul. 57-7

January, 1957

Advice has been requested as to the nature, for Federal tax purposes, of the agreements hereinafter described, under which a corporation places coin-operated amusement and gaming devices on premises occupied by another.

M corporation owns slot machines, juke boxes, and pinball machines, as well as other amusement and gaming devices which are placed in various locations with the permission of the occupant of the premises. The parties agree that the occupant will receive a stipulated percentage of the receipts from the machines, after deduction of certain expenses, as remuneration for permitting the machines to occupy space in his establishment. Although the machines are owned by M corporation, the tax stamps are properly purchased by the occupant of the premises in his own name and he is reimbursed therefor by M corporation.

The machines can be opened only by a collector employed by M corporation who counts the money, usually in the presence of the occupant of the premises or one of his employees. The collector reimburses the occupant as to any payouts and then pays him the agreed percentage of the balance. Under the agreement between the parties, the occupant of the premises on which the machines are located is to make change for customers, if necessary, and to pay out any prizes or winnings. It is further understood by the parties that M is to pay the costs of repairing and installing the machines as well as all other expenses with respect thereto, and that M is to bear the losses from the operation of the machine, if any.

In view of the foregoing, those arrangements for Federal tax purposes constitute leases of space for the location of the machines entered into by M corporation, as lessee, with the occupants of the premises where the machines are placed, as lessors. If the remuneration paid by the corporation to the occupant of the premises (if other than a corporation) in any taxable year amounts to $600 or more, the corporation is required, under section 6041 of the Internal Revenue Code of 1954, to file information returns on Forms 1096 and 1099 with respect to such remuneration.

fact, it seems to us that if such a reporting requirement is laid on the one, basic notions of fairness would mandate that it also be laid on the other. Such a mandatory conclusion, however, would produce an untenable result, as it would engender a situation whereby the half of the proceeds that is income to one party at the same time constitutes the other party's "payment" for § 6041(a) purposes. As we noted above, however, for a party to be able to make a "payment" to another, it must first have received the sum of money to be "paid" under a claim of right, that is to say, the sum that is to be "paid" must first constitute income to the party making the "payment." Thus, each half of the proceeds would constitute income to both parties at the same time. The absurd world into which this rent/lease characterization has taken us compels us to reject the Service's position as it was expressed in Revenue Ruling 57–7. The only way to view the situation within the realm of the logical is to say that only the half of the income which one party keeps is income to that party, and that the other half is not income to him but to the other which is merely transferred, not "paid," under the existing agreement. This situation, as it is all too clear, is precisely the one we have described under Part A of this opinion. And, under this view of the universe, it is also clear that no § 6041(a) reporting should ever have taken place.

*Epilogue*

To sum up, the Court finds that the evidence presented at trial showed that the oral and written agreements between the plaintiff and the various establishments did not constitute leases of space which would have required the former to make payments to the latters within the meaning of § 6041(a). The arrangements were, in essence, joint ventures in which the parties agreed to share in the profits as well as the expenses, each party being entitled, as a matter of right, to one half of the proceeds from the moment the monies started to come in. This being so, the reporting requirements for payments made under § 6041(a) were not applicable, and the assessment of civil penalties by the Government cannot be allowed to stand.

WHEREFORE, in view of the foregoing, it is hereby ORDERED that the penalties paid by Manchester Music in the amount of $795.77 be refunded with interest and that the defendant be enjoined from levying on the plaintiff the balance of the penalties assessed for violations of § 6041(a) and § 6652(a)(1)–(a)(2) for the tax years of 1982 and 1983.

IT IS SO ORDERED.