**JJR, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. C95–1744D.**

United States District Court,
W.D. Washington,
at Seattle.

Jan. 3, 1997.

Darrell D. Hallett, Larry N. Johnson, Chicoine & Hallett, P.S., Seattle, WA, for JJR, Inc., plaintiff.

Diane E. Tebelius, U.S. Attorney's Office, Seattle, WA, Sanford Stark, U.S. Department of Justice, Tax Division, Washington, DC, for United States of America, defendant.

## ORDER GRANTING PLAINTIFF'S SUMMARY JUDGMENT MOTION FOR § 530 RELIEF

DIMMICK, Chief Judge.

The Court revisits here issues of federal tax liability applied to owners of nightclubs in which nude and semi-nude dancers perform. In an earlier case, this Court denied summary judgment as to whether the performers were employees whose wages were paid by the nightclub owner (taxpayer). *Marlar, Inc. v. United States*, 934 F.Supp. 1204 (W.D.Wash.1996). Nonetheless, the Court granted relief for the tax years in question on the basis of § 530 (safe haven). The same result is compelled here, although the facts and issues differ somewhat. The parties (and the Court) have learned from *Marlar*, and counsel have expanded and further refined their arguments as a result.

### FACTS

Plaintiff taxpayer, JJR, Inc., paid a portion of employment taxes, penalties, and interest assessed against it by the IRS for the tax period from October 1, 1991 through December 31, 1992. JJR filed refund claims with the IRS, which were denied. JJR then filed this suit for refund, and the United States counterclaimed for the remainder of the assessed liabilities. Jurisdiction is proper pursuant to 26 U.S.C. § 7402 and 28 U.S.C. §§ 1340, 1345, and 1346(c).

JJR, Inc. (whose president and sole shareholder is Dean Reiber) operated "Rick's" during the period at issue. Rick's is a club in

Tacoma, Washington, featuring nude and semi-nude dancing by female performers. JJR opened the club in 1991 and began using a written contract with the performers. By the end of 1992, all performers had signed the contract. One performer testified that she was required to sign the contract. Provisions in the contract did not differ substantively from the prior practice at the club. The contract contained, among other clauses, the following:

6. COMPLIANCE WITH RULES, REGULATIONS—OWNER shall have the right to impose such rules and regulations on the use of the PREMISES by PERFORMER as OWNER, in its sole and absolute discretion, shall deem necessary and appropriate. PERFORMER agrees to be bound by and to otherwise adhere to each and every rule and regulation imposed by OWNER in connection with her use of the PREMISES.

7. STATUS OF PARTIES—The parties hereto acknowledge that the status created between OWNER and PERFORMER is that of a lease for use of the PREMISES. The parties hereto specifically negate any employment relationship. PERFORMER shall exclusively be responsible for and pay all federal, state, and local taxes and contributions imposed or required at any time by unemployment, workman's compensation, social security, and income tax laws, and any other applicable laws, rules or regulations imposed upon or asserted in connection with any income earned by PERFORMER at the PREMISES. PERFORMER hereby specifically acknowledges that the rent being paid by PERFORMER pursuant to this LEASE would have been significantly greater if the relationship between OWNER and PERFORMER were deemed to be that of any employer/employee. PERFORMER acknowledges and agrees that in the event that any governing federal or state agency determines that the relationship between OWNER and PERFORMER is other than that of Landlord and Tenant, PERFORMER agrees to reimburse and otherwise hold OWNER harmless from any and all monies determined to be due PERFORMER. If the aforesaid action was initiated or supported by PERFORMER'S assertion that the relationship is other than Landlord and Tenant, then, in addition to the reimbursement heretofore set forth, PERFORMER shall pay to OWNER all additional costs and expenses incurred by OWNER, including actual and reasonable attorney's fees in defense thereof.

8. COSTUMES—PERFORMER shall supply her own costumes and wearing apparel of any kind and nature, and OWNER shall have no responsibility or liability in connection therewith.

9. NATURE OF PERFORMANCE—OWNER shall have no right to direct or control the nature, content, character, manner, or means of PERFORMER'S performance. PERFORMER acknowledges and agrees, however, to perform live nude or semi-nude entertainment consistent with the type of entertainment regularly performed at the PREMISES.

Other clauses in the contract relate to the performer's scheduling of dates (at least once a week for a minimum of six hours) ¶3; the payment of "rent" to the owner ($5 per hour or $30 minimum) ¶4; and performer's obligation to perform "during all hours of each shift for which she has let the PREMISES" ¶5. The rent was to be paid regardless of the performer's income on a particular day. There is some dispute as to whether the $30 minimum rent was sometimes excused.

In practice, it is undisputed that the performers were paid directly by customers, and could negotiate a price. There was, however, a $10 minimum fee per dance, which was established either by the taxpayer or by agreement of the performers. It is not clear how often the fee exceeded $10. The performers kept this money and gave no accounting to the owner. In addition to paying rent, performers had to pay a $10 service fee each night they danced. This fee could be covered by a customer's purchase of a nonalcoholic ladies' drink for $10. A ledger was kept for these first drinks. Subsequent purchases of ladies' drinks resulted in a $5 take

by the owner and $5 to the performer.[1] The customer was then entitled to talk with the performer. The manner of purchase varied. Drinks regularly cost $5.[2]

If a customer wished to use his credit card, Rick's issued Rick's Chips, worth $5 each. If the chips were used to pay the performers, the performers could redeem the chips, but a 10% service charge was deducted.

Three motions are before the Court: (1) plaintiff's motion for summary judgment determination that it paid no wages; (2) the government's motion for partial summary judgment determination that performers are employees of JJR; and (3) plaintiff's motion for summary judgment under § 530 (safe haven). The first and second motions will be discussed in concert next. The third motion will be discussed separately.

## DISCUSSION

### Wages/Employees

Because the definitions of "wages" and "employees" are linked, it is not clear to this Court that there can be one without the other.[3] Certainly, in all the cases cited by the parties here, some transfer or receipt of funds was involved.

Plaintiff taxpayer seeks a determination by this Court as a matter of law that no payments constituting wages within the meaning of the Internal Revenue Code, 26 U.S.C. § 3101, 3111, 3301, 3401, and 3402 have oc-

curred.[4] This is essentially the same argument used in the earlier case by Marlar.

The government cross moves for partial summary judgment "seeking a judicial determination that for federal employment tax purposes, the performers at issue qualify as plaintiff's employees as a matter of law." CP 53 at 2. The government's premise is that plaintiff's control over performers as described in their written contract (¶ 6) establishes an employer/employee relationship.

Taxpayer points out that there is no definition of "payment" in the tax code, although 26 U.S.C. § 3401 defines "wages" to mean:

all remuneration ... for services performed by an employee for his employer, including the cash value of all remuneration (including benefits) paid in any medium other than cash; ....

Taxpayer contends that payment does not occur unless there is a direct transfer of money "from the debtor to the creditor for the purpose of extinguishing the debt, and the creditor must receive it for the same purpose." Bailey v. Commissioner, 103 F.2d 448, 449 (5th Cir.1939). Taxpayer also relies on a definition of "payment" put forth in Manchester Music Co., Inc. v. United States, 733 F.Supp. 473, 482 (D.N.H.1990):

[A] payment occurs with the transfer of possession, dominion, or control over money or its equivalent from a person who up to that point had been exercising such prerogatives over the same to another who is due the funds.

---

**1.** As one dancer put it, she seldom sold ladies' drinks: "Just not worth the hassle." Deposition of Sheri Vernon at 49. Ms. Vernon explained that she would purchase a drink from the bartender directly—pay him $5 and keep $5—on those occasions when a customer wanted one.

**2.** Reiber's declaration is to the effect that few ladies' drinks are sold. He estimated less than 5% of the total drinks sold in any one day, less than 2% some days. CP 51 at 6.

**3.** "Wages" is defined as follows: "A compensation given to a hired person for his or her services. Compensation of employees based on time worked or output of production." Black's Law Dictionary 1579 (6th ed. 1990).

"Employee" is defined as follows: "A person in the service of another under any contract of hire, express or implied, oral or written, where

the employer has the power or right to control and direct the employee in the material details of how the work is to be performed.... One works for an employer; a person working for salary or wages." Id. at 525.

A 1944 opinion from the Fourth Circuit Court of Appeals noted that there could be a "relation of employer and employee without the payment of wages" where a party had volunteered to work for another. Magruder v. Yellow Cab Co. Of D.C., 141 F.2d 324, 326 (4th Cir.1944). The Magruder court, however, noted that in order to impose a valid tax, wages must be paid by the employer. Id. at 325.

**4.** For purposes of this motion only, taxpayer is willing to concede that the performers are employees. Otherwise, taxpayer vigorously contests the designation.

Taxpayer also relies on Rev.Rul. 69–26, 1969–1 C.B. 251 ("the caddy ruling"). There, the Commission opined that caddies, who were paid directly by the members of the golf club, were not the employees of the club, even though the club permitted members to charge the fees paid to the caddies—a pass through. JJR also points out that Revenue Rulings may be relied upon by a taxpayer as a shield, although they are not controlling on a court. *See Estate of Kosow*, 45 F.3d 1524, 1528 n. 4 (11th Cir.1995).

Taxpayer also analogizes to the tax treatment of tips received directly from customers. Thus, taxpayer argues it was Congress' intent not to impose on the employer any obligation for withholding funds not in its possession or for which it lacks an accounting.

Taxpayer argues that it is never in possession of money received by the performers. In its view, the 50% cut on ladies' drinks given to the performer is just the customer's payment for her services. It gives him (customers are invariably men) the right to talk to her for a period of time; and, in any event, this amount of money is a minor part of the performer's receipts. Her payment for the dances is negotiated with the customers and is a direct transaction between the customer and performer. Taxpayer receives no percentage of this payment and keeps no record of dances performed. The redemption of chips obtained by credit cards is merely a pass through. Non-credit card customers pay the performers directly; credit card customers pay with chips, with the taxpayer retaining a 10% "service charge."

The government counters by arguing that even if payments to the performers do not come directly from the taxpayer, there is an employer-employee relationship and a constructive receipt of salary. The government's basic premise is that if a party is given control over the details of how the work is done, it is an employer. The government places much of its reliance on a forty-year-old Ninth Circuit case, *Westover v. Stockholders Pub. Co.*, 237 F.2d 948 (9th Cir.1956). In that case, the court held that route men and dealers maintaining delivery service of newspapers were employees despite the fact that they received no salary as such. The court based its decision on these facts: The newspaper set the time for pickup and delivery of papers, it exercised general control of the routes, set the wholesale price at which the route men and dealers purchased the papers, and in general determined the retail price. The route men and dealers earned their profits on the difference between the wholesale and retail prices. The maximum was thus limited and a minimum amount of earnings was guaranteed by the newspaper. The workers provided their own cars, but were given a mileage allowance. The court concluded that under the circumstances route men and dealers were employees and the taxpayer was responsible for social security taxes even though no payments were paid directly to them by the newspaper. The *Westover* case did not analyze the statute and the requirement of "payment of wages" as plaintiff does here.

The government also insists that every case adjudicating the classification of dancers has concluded that they were employees. *See, e.g., Matcovich v. Anglim*, 134 F.2d 834 (9th Cir.), *cert. denied*, 320 U.S. 744, 64 S.Ct. 46, 88 L.Ed. 441 (1943) (taxi dancers were employees, not licensees); *Mladinich v. United States*, 379 F.Supp. 117 (S.D.Miss. 1974) (go-go dancers were employees, not independent contractors, where taxpayer paid their salary by the week and controlled hours); *Reich v. Priba Corp.*, 890 F.Supp. 586, 593 (N.D.Tex.1995) (where performers determined costumes and how to dance, they were nonetheless "employees" rather than independent contractors under the Fair Labor Standards Act).

As an initial matter, the Court must address the government's position that the contract itself at ¶ 6 confers absolute control, and that the fact of employment is thus established. In response, JJR argues that ¶ 6 provides nothing more than the usual lease, giving the owner control over use of the premises. This Court's reading of the contract as a whole is that there is, at the least, an ambiguity created between ¶ 6 and other elements of the contract—particularly ¶ 9 and the lease arrangements. An ambiguity in a contract is to be determined by the

court. *McGary v. Westlake Investors*, 99 Wash.2d 280, 285, 661 P.2d 971 (1983) (citing *St. Yves v. Mid State Bank*, 111 Wash.2d 374, 377, 757 P.2d 1384 (1988)). In this particular contract, the Court concludes that there is an ambiguity precluding a decision that the performers are employees. Even if the government is correct that the contract indicates taxpayer's right to absolutely control the performers, there remain issues of fact as to whether performers receive some remuneration from the taxpayer.

■ In considering the question of payment of wages, the Court considers separately the three sources of the performer's income.[5] The payment negotiated with and received directly from the customer is similar to the taxidriver's receipts in *New Deal Cab Co. v. Fahs*, 174 F.2d 318 (5th Cir.), *cert. denied*, 338 U.S. 818, 70 S.Ct. 62, 94 L.Ed. 496 (1949). The performers at Rick's were liable to taxpayer for rent regardless of how much income they received from customers. They paid no percentage of their receipts to taxpayer and did not account to taxpayer for the number of dances or the total received. The performers at Rick's thus differ from the taxidancers in *Matcovich*. In *Matcovich*, all payments to the dancers were made with tickets purchased from the proprietor. The dancers redeemed the tickets and were given a set percentage.

In *Mladinich* and *Priba*, there was no issue as to taxpayer's payment—the issue was categorization of the dancers as employees instead of independent contractors, as taxpayer had asserted. Therefore, it appears to this Court that the cash payments from the customers to the performers at Rick's were not wages (or even payments) from taxpayer.

As to the income the dancers received from Rick's Chips, analysis is more difficult. There is some similarity to the tickets purchased in *Matcovich*, but in *Matcovich* all payments to the dancers were made through the purchase of tickets controlled by the proprietor. Here, taxpayer keeps 10% of the charges when redeeming chips for the per-

formers. This would appear to be a reasonable service charge, but this issue cannot be decided on summary judgment.

The third source of income—the 50% cut on ladies' drinks—is even more problematic. It would appear to be in the nature of a commission, although taxpayer insists that the dancer's share represents the customer's purchase of her time. In any event, it does not represent a large part of the performer's income. Whether these payments constitute "wages", however, cannot be decided on summary judgment.

Thus, under standards for summary judgment, pursuant to Fed.R.Civ.P. 56, this Court cannot determine as a matter of law that plaintiff taxpayer does or does not pay some wages to or employ the performers in some capacity.

The Court can conclude, however, as a matter of law, viewing all disputed facts in the government's favor, that the payments to the performers from customers (including credit card payments) are not subject to employment taxes for the period in question. This conclusion rests on the "caddy case" cited by taxpayer.

> Although the caddies may be employees of the club, it will not be required to pay the tax imposed by section 3111 or section 3301 of the above-mentioned Acts, respectively, relative to payments made to the caddies for services performed by them for its members where such payments are made directly by the member players, or where the club in making the payments is acting as the agent of the members and is in no way obligated to make the payments. In such cases, the remuneration is not wages paid by the club.
>
> If the caddies perform services for the club for which the club itself pays them, the club will be subject to the tax imposed by section 3111 of the Federal Insurance Contributions Act and section 3301 of the Federal Unemployment Tax Act, provided

---

5. This analysis is relevant to § 530 (safe haven) discussed in the next section. There the issue is whether taxpayer paid more than $600 to an individual performer in a given year, thus requiring the filing of tax forms.

the other requirements of those sections are met.

Rev.Rul. 69–26, 1969–1 C.B. 251.

The Ninth Circuit Court of Appeals recognizes that Revenue Rulings are entitled to deference and generally may be relied upon "unless unreasonable or inconsistent with the provisions of the Internal Revenue Code." *Walt Disney, Inc. v. Commissioner,* 4 F.3d 735, 740 (9th Cir.1993) (quoting *Salomon, Inc. v. United States,* 976 F.2d 837, 841 (2d Cir.1992)). The facts in the present case are very similar to the caddy case in that the customers paid the performers directly for services to the customer and with no sharing or accounting to the nightclub. Similarly, the nightclub merely serves as an agent for the customer for credit card transactions and is not obligated to make the payments.

There remains, however, an issue of fact as to whether a performer's income from ladies' drinks constitutes "wages". These possible "payments" do not fall within the scope of Revenue Ruling 69–26.

In summary, although some of the income received by the performers is not "wages," there remain issues of material fact as to whether there were any payments of wages and as to the classification of the performers. Summary judgment on these issues is denied.

### Section 530 Relief

■ As an alternative basis for refund, plaintiff taxpayer seeks relief under § 530 of the Revenue Act of 1978, as amended, 28 U.S.C. § 3401 (1992).[6] Section 530 reads in pertinent part as follows:

(a) **Termination of certain employment tax liability.—**

(1) **In general.—If—**

(A) for purposes of employment taxes, the taxpayer did not treat an individual as an employee for any period, and

(B) in the case of periods after December 31, 1978, all Federal tax returns (including information returns) required to be filed by the taxpayer with respect to such individual for such period are filed on a basis consistent with the taxpayer's treatment of such individual as not being an employee, then for purposes of applying such taxes for such period with respect to the taxpayer, the individual shall be deemed not to be an employee unless the taxpayer had no reasonable basis for not treating such individual as an employee.

(2) **Statutory standards providing one method of satisfying the requirements of paragraph (1).—**For purposes of paragraph (1), a taxpayer shall in any case be treated as having a reasonable basis for not treating an individual as an employee for a period if the taxpayer's treatment of such individual for such period was in reasonable reliance on any of the following:

(A) judicial precedent, published rulings, technical advice with respect to the taxpayer, or a letter ruling to the taxpayer;

(B) a past Internal Revenue Service audit of the taxpayer in which there was no assessment attributable to the treatment (for employment tax purposes) of the individuals holding positions substantially similar to the position held by this individual; or

(C) long-standing recognized practice of a significant segment of the industry in which such individual was engaged.

JJR's basis for asserting § 530 safe haven relief is (1) that the plaintiff has never treated any performer as its employee, (2) that the plaintiff has never filed any required federal tax returns on a basis inconsistent with the treatment of performers as other than nonemployees, and (3) that the plaintiff has a reasonable basis for not treating performers as employees.

In addition to the facts already outlined above, some additional points come into play here. In 1987 or 1988, certified public accountant Ernst Johnson had responded to an inquiry from an attorney representing various nightclubs in the area. Mr. Johnson

---

**6.** As explained in *Springfield v. United States,* 88 F.3d 750, 751 n. 2 (9th Cir.1996), this section has never been codified, but is located in the notes following 26 U.S.C. § 3401. The issue in *Springfield* was whether taxpayer was entitled to § 530 relief when he treated certain workers as independent contractors as did a significant segment of the industry, but not every segment. The appeals court held that it was. The government in the present case has not contested this issue.

responded that the performers could properly be classified as self-employed entertainers, leasing space from the nightclub owners. Additionally, it was his conclusion that the nightclubs were not required to issue forms 1099 because no payments were made to the performers. In 1990, the IRS commenced an audit of the 1988 tax returns of Dean C. Reiber.[7] According to tax accountants representing Reiber during this audit, revenue agent Raymond Devoe required no changes in Reiber's then current tax returns and proposed no assessment on the basis of Reiber's treatment of its performers as non-employees. In reliance on this audit and the advice of his accountants, Reiber utilized the same structure and method of operation when he formed JJR, Inc. in October 1991.

JJR also points to the longstanding industry practice of treating the performers as nonemployees—self-employed entertainers and tenants of the night clubs. This industry practice was recognized in *Marlar*, 934 F.Supp. at 1209.

The government's present position is similar to its position in *Marlar*. That is, plaintiff is not entitled to § 530 safe haven because it failed to issue form 1099 information returns to the performers and failed to file forms 1099 and 1096 with the IRS, treating the performers as independent contractors. These forms are required if a taxpayer makes payments of $600 or more.

> All persons engaged in a trade or business and *making payment* in the course of such trade or business to another person, of rent, salaries, wages, premiums, annuities, compensations, remunerations, emoluments, or other fixed or determinable gains, profits and income ... shall render a true and accurate return to the Secretary....

26 U.S.C. § 6041 (emphasis added).

The government relies on several cases that did indeed require the taxpayer to have filed 1099 forms. *See, e.g., Henry v. United States*, 793 F.2d 289, 291 (Fed.Cir.1986) ("In order to qualify for the automatic relief specified therein [§ 530] the taxpayer is required to file all federal tax returns, including information returns (forms 1099) ... on a basis which is consistent with the taxpayer's treatment of each worker as an independent contractor rather than as an employee."); *In re Bentley*, 73 AFTR.2d ¶ 94–667, 94–1369 to 94–1372, 1994 WL 171200 (Bankr.E.D.Tenn. 1994), *modified*, 74 AFTR.2d ¶ 94–5050, 94–5119, 1994 WL 496692 (Bankr.E.D.Tenn. 1994) (longstanding practice of trucking industry recognizing drivers as independent contractors would not avail taxpayer where it had failed to file the form 1096 and/or form 1099), *aff'd*, 175 B.R. 652 (E.D.Tenn.1994). In both of these just cited cases, the taxpayer was asserting that any payments made by the taxpayer were to independent contractors, not employees.

The government's argument here and in the *Marlar* case was that the performers were of necessity either employees or independent contractors: if the former then taxpayer withholds employment taxes and issues W–2 forms to the performers, covering all their income; if the latter, then the taxpayer must issue forms 1099 to the performers and file forms 1099 and 1096 with the IRS.[8] Plaintiff here filed none of these forms.

---

7. Dean C. Reiber was president and sole shareholder of DCR at that time, and is the president and sole shareholder of JJR, the plaintiff in this action.

8. The government respectfully suggests that the Court's decision in *Marlar* was wrong in several respects. *See* CP 55, n. 7 and n. 8. First the government says the Court was wrong in its statement that the lessor/lessee need not file forms 1099 (934 F.Supp. at 1210). What the Court meant is that a lessor *receives* payments, and does not have to report payments except as income.

As to the second alleged error, the government, again respectfully, suggests that this Court is incorrect to the extent it merged the reporting requirement of § 530(a)(1)(B) with the "industry practice" safe haven of § 530(a)(2)(C). In this regard, the *Marlar* court appeared to suggest that an industry practice of failing to issue Forms 1099 was relevant to the determination of whether the plaintiff therein qualified for § 530 relief.... Consistent with the foregoing authorities, however, the United States respectfully submits that the question of whether a taxpayer filed all necessary tax returns in accordance with § 530(a)(1)(B) is entirely distinct from the inquiry under § 530(a)(2)(C) as to whether there was a long-standing industry practice of treating the performers as other than employees.

In *Marlar,* the government made no attempt to characterize separately the various income sources received by the performers and address their separate reporting requirements. As an alternative in the present case, the government does refer to the sources and reporting requirements separately. Implicit in that analysis is an assumption that in some situations taxpayer and performer may be in an employee/employer relationship (necessitating the withholding of employment taxes); in others the relationship may be business/independent contractor (requiring 1099 forms); or owner/tenant (requiring only that income be reported). The caddy case recognized that there could be different relationships.

The Court commences its consideration of the availability of § 530 relief with three questions. First, did taxpayer consistently treat performers as nonemployees? The undisputed answer is "yes." Second, was taxpayer's treatment of performers as other than employees (self-employed tenants) reasonable? Here, the answer is clearly "yes" as supported by the industry practice and accounting advice. The only remaining question then follows: Did taxpayer comply with tax reporting requirements consistent with its treatment of the performers as nonemployees and tenants? Again, this Court would say "yes." It is uncontested that taxpayer reported income received from the lease agreements with the performers, reported income received from the sale of ladies' drinks, and reported income received from the 10% service charges for redemption of chips.

Alternatively, if the Court is required to examine separately the source of the performer's income to determine reporting requirements, the result is the same, but the analysis differs. The performer's income is derived from three sources as discussed earlier: First, customers' cash payments for dances; second, customers' payments for dances through credit card transactions and redemption of chips; and third, receipt of the performer's share of ladies' drinks charges. The first source does not involve a payment to the performer from the taxpayer. The

performers were paid by customers, did not share any portion of this income with the taxpayer; and were not required to, nor did they, account to taxpayer for this income. On the undisputed facts, taxpayer had no duty to report this segment of the performer's income. This conclusion can also be supported by Rev.Rul. 69–26, 1969–1 C.B. 251 ("the caddy case") (money paid directly to caddies by members of the golf club were not "payments" by the club).

The second source of income to the performers is Rick's Chips. Customers wishing to use their charge cards could purchase the chips to pay the performers. The Court is inclined to accept taxpayer's explanation that this is an accommodation to its customers and that the 10% fee represents the cost of processing the charges. The Court recognizes, however, that this may be an issue of fact. The government contends that at least one performer reported a third of her income came from redeemed chips, and the Court can infer from the facts that performers received more than $600 per year from this source. In any event, the caddy case offers an alternative basis for concluding that there were no § 6041 reporting requirements for payments to the performers for the redemption of chips.

The third source of the performer's income is the sale of ladies' drinks. The first drink sold in the evening results in a $10 credit against the individual performer's obligation to pay a $10 service charge. Additional ladies' drinks purchased by customers for $10 result in $5 shared with the performers. The Court concedes that the initial $10 credit and subsequent $5 per drink shared with the performers may constitute "payments" for purposes of § 6041 reports. The evidence presented, however, is that this income is minimal. One dancer states that it is not worth the bother. The club owner states that it is less than 5% of its total income for drinks. The government has not argued nor offered evidence that the amount in question is more than $600 per year for any single performer.

United States' Opp. to Pl.'s Mot. for Summ.J. Re: § 530 at 11 n. 7.

The Court acknowledges a compressed analysis in *Marlar,* which it hopes is clarified here.

A summary judgment motion requires an opposing party to come forward with evidence to counter facts offered by the maker of the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). In the present case, the government was granted a continuance pursuant to Fed. R.Civ.P. 56(f) to pursue discovery. The government has not offered evidence to support a reporting requirement for ladies' drinks.

The government accuses plaintiff of deliberate blindness to the earnings of the performers and of bad faith efforts to avoid payment of employment taxes. This position seems more than a little disingenuous, since the industry has operated openly for some twenty years without challenge, and an IRS audit of a similar establishment's 1988 returns failed to find fault.

The government explains the rationale for § 1099 reporting: to obtain increased tax revenue from the workers. More significant to the Court, however, is the protection of the workers afforded by employment taxes. Neither of these laudatory goals, however, justifies a misreading of the law.

THEREFORE, plaintiff's summary judgment motion for relief pursuant to § 530 is GRANTED entitling it to a refund of taxes paid; plaintiff's motion for summary judgment as to payment of wages and defendant's motion for partial summary judgment are DENIED, but in light of the § 530 relief, it is not necessary to go forward with trial on these issues.

The Clerk of the Court is directed to enter judgment for plaintiff accordingly and send copies of this order to all counsel of record.