**SALOMON INC., Plaintiff–Appellant,**

v.

**UNITED STATES of America, Defendant–Appellee.**

No. 1725, Docket 92–6069.

United States Court of Appeals, Second Circuit.

Argued June 26, 1992.

Decided Oct. 6, 1992.

Stuart E. Seigel (Victor Zonana, Kent L. Killelea, of counsel), Arnold & Porter, New York City, for plaintiff-appellant.

Steven C. Bennett, Asst. U.S. Atty. (Otto G. Obermaier, U.S. Atty., for the Southern District of New York, Sharon Cohen Levin, Asst. U.S. Atty., of counsel), for defendant-appellee.

Before: NEWMAN, PRATT, and WALKER, Circuit Judges.

WALKER, Circuit Judge:

In the years prior to 1981 plaintiff-appellant Salomon Inc. received tax credits for investments it had made in machinery and equipment assets. In 1981, when Salomon transferred the assets to a subsidiary and then spun-off the subsidiary to its shareholders, defendant-appellee United States required Salomon to pay back a portion of the credits received pursuant to the Internal Revenue Code's "recapture" provision. *See* 26 U.S.C. § 47(a)(1) (1976). Salomon claims that recapture was not proper. The United States District Court for the Southern District of New York (Louis J. Freeh, *Judge*), in a Judgment entered February 27, 1992, granted summary judgment to the United States and denied Salomon's summary judgment motion. We agree that recapture was appropriate, and affirm.

## BACKGROUND

The corporate history of this lawsuit dates back to 1960 when Philipp Brothers, a world-wide marketer of raw materials, merged with a mineral refining company known as The Minerals & Chemicals Group. The two formed the Minerals & Chemicals Philipp Corporation which, in 1967, itself merged with Engelhard Industries, a leading fabricator of products containing precious metals. Management thought that combining the three components would create synergies from which each of the individual businesses would benefit. The merger resulted in the formation of Engelhard Minerals and Chemicals Corporation ("EMC"), a broad-based company involved in the refinement, manufacture, trading and marketing of various mineral and non-mineral raw materials. EMC is now known as Salomon Inc. and is the plaintiff in this case.

By 1980 it had become apparent that the whole was not greater than the sum of its parts. The merger appeared to be reducing the competitiveness of the individual divisions in their respective fields. Tensions developed between EMC's marketing arm, the Philipp Brothers Division, and its industrial divisions comprised of the former Engelhard Industries and The Mineral & Chemical Group when the marketing arm did business with the competitors of the industrial divisions and vice versa. The distinct corporate culture and compensation structure of Philipp Brothers, which was bringing in the lion's share of profits, further contributed to these tensions.

For these reasons, EMC's Chairman Milton F. Rosenthal developed in early 1981 a plan to separate the respective companies better to realize their potential values. EMC would sell all of the assets and liabilities of the industrial divisions to Porocel, an existing wholly owned subsidiary involved in the mining of rare earths and later renamed Engelhard Corporation ("EC"). In exchange, EMC would receive additional EC stock. EMC would then "spin-off" this reconstituted corporation by distributing all of its EC shares pro-rata to its stockholders. EMC stockholders, who had formerly owned stock in one giant corporation, would now hold shares in two independent companies. Each would be run true to its own corporate culture and, it was hoped, each would regain its competitive footing.

Rosenthal's plan rapidly materialized. After several meetings, EMC's board of directors on March 31, 1981 authorized the transfer of assets and liabilities to EC and

the distribution of EC shares, though reserving the right to cancel the distribution at any time prior to consummation. In the morning of May 18, 1981, EMC and EC formally executed the asset transfer. On May 20, 1981, EMC shareholders voted overwhelmingly in favor of the distribution of EC stock, and the EMC board of directors ratified the transfer of assets to EC. Finally, on May 22, 1981, EMC's board authorized the distribution of EC shares. Thus, in five days the asset transfer and spin-off were complete.

EMC, concerned that it or its shareholders might have to recognize gain or loss on the distribution of EC stock, sought an Internal Revenue Service ("IRS") private letter ruling that the transaction qualified as a divisive "D" reorganization pursuant to Internal Revenue Code ("IRC" or "Code") § 368(a)(1)(D). This provision covers reorganizations consisting of

> a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor, or one or more of its shareholders ... is in control of the corporation to which the assets are transferred; but only if, in pursuance of the plan, stock or securities of the corporation to which the assets are transferred are distributed in a transaction which qualifies under section 354, 355, or 356[.]

26 U.S.C. § 368(a)(1)(D) (1976). A corporation distributing stock pursuant to a divisive "D" reorganization recognizes neither gain nor loss. 26 U.S.C. § 361(a) (1976). Nor do the shareholders who receive such stock. 26 U.S.C. § 355(a)(1) (1976). In the afternoon of May 18, 1981, after the time at which EMC and EC had completed the asset transfer, the IRS issued the requested ruling. The ruling affirmed that the transaction qualified as a divisive "D" reorganization, and that neither EMC, nor its shareholders, would recognize gain. However, the IRS conditioned the ruling on EMC's agreeing to the "recapture," or paying back, of certain investment tax credits that EMC had earlier taken.

This brings us to the core tax issues in the case. By way of background, the Internal Revenue Code in calendar year 1981 provided an "investment tax credit" to taxpayers who invested in certain business-related machines and equipment known as "section 38 property" (named after the provision establishing the credit). *See* 26 U.S.C. §§ 38, 46 (1976 & Supp. IV 1980). The investment tax credit reduced dollar-for-dollar the tax due for the year in which the taxpayer put the section 38 property into service. 26 U.S.C. § 38 (1976). The purpose of the tax credit was "to encourage modernization and expansion of the Nation's productive facilities ... [by] reduc[ing] the net cost of acquiring new equipment ... and [thereby] increasing the profitability of productive investment." S.Rep. No. 1881, 87th Cong., 2d Sess. 11 (1962), *reprinted in* 1962 U.S.C.C.A.N. 3304, 3314.

In tax year 1981, the investment tax credit equalled 10 percent of the cost of the section 38 property if the property's useful life was seven years or more. *See* 26 U.S.C. §§ 46(a)(2)(B), 46(c)(2) (1976 & Supp. IV 1980). This percentage declined if the property's useful life was shorter. Certain other limitations on the credit also applied which are not of relevance to this lawsuit.

"To guard against a quick turnover of assets by those seeking multiple credit," S.Rep. No. 1881, 87th Cong., 2d Sess. 18 (1962), *reprinted in* 1962 U.S.C.C.A.N. 3304, 3320, Congress provided in § 47(a)(1) for the "recapture" of the investment tax credit where the taxpayer "disposed" of the section 38 property before the end of its useful life. This provision required, for example, that a taxpayer who purchased section 38 property with a useful life of seven years and took the full 10 percent credit, but who then disposed of the property after only six years of use, recalculate the investment tax credit using the 6.67 percent figure appropriate for property with a useful life of six years. The taxpayer was then required to repay the difference in the taxable year in which the disposition occurred. *See* 26 U.S.C. § 47(a)(1) (1976). Section 47(b) established certain exceptions to recapture. 26 U.S.C. § 47(b) (Supp. IV 1980).

Certain of the machinery, equipment and other assets that EMC planned to transfer to EC qualified as section 38 property. In the years prior to 1981, EMC had taken investment tax credits related to its purchase of this property. The IRS viewed the 1981 transfer of this property to EC followed by a spin-off to EMC shareholders as a "disposition" which triggered § 47(a) recapture. As a condition of its private letter ruling, it therefore required that EMC agree to a recapture of the credit with respect to the section 38 property that had not yet reached the end of its useful life.

By letter dated April 11, 1981, Arthur Anderson & Co., on behalf of EMC, agreed to the recapture. The IRS' May 18, 1981 private letter ruling noted EMC's representation that "the investment tax credit previously claimed on 'section 38 property' transferred by [EMC] to [EC] will be reported by [EMC] in its federal income tax return as an adjustment in the year of transfer...." EMC, in its 1981 consolidated income tax return, paid an additional $9,556,151.00 for the recapture of the investment tax credits.

Salomon Inc, formerly EMC, brought this action on July 9, 1990, to recover the recapture taxes paid in 1981. The parties agreed that there was no material issue of fact and each moved for summary judgment.

Salomon premised its summary judgment argument on the fact that EMC and Porocel, the predecessor to EC, were affiliated companies which filed a consolidated income tax return. The consolidated return provisions, 26 U.S.C. § 1501 et seq. (1976), and the regulations promulgated thereunder, "permit affiliated corporations ... to be treated as a single entity for income tax purposes as if they were, in fact, one corporation." *American Standard, Inc. v. United States*, 220 Ct.Cl. 411, 602 F.2d 256, 261 (1979). For example, the group's tax liability is based on a "consolidated taxable income" determined by aggregating the separate income or loss of each member. The group is taxed for the most part only on its dealings with third-parties.

Pursuant to these principles, § 1.1502–3(f)(2)(i) of the Consolidated Return Regulations ("CRR"), provides that "a transfer of section 38 property from one member of the [consolidated return] group to another member of such group during a consolidated return year shall not be treated as a disposition or cessation within the meaning of section 47(a)(1)." Treas.Reg. § 1.1502–3(f)(2)(i). Relying on this regulation, Salomon contended that the first component of the transaction, the asset transfer between EMC and EC, both members of the same consolidated group, was not a "disposition" within the meaning of IRC § 47(a)(1) since both were members of the same consolidated group and did not trigger recapture.

Salomon further argued that the second component, the "spin-off" of EC, did not require recapture because the section 38 property had remained in the same corporation even though the corporation itself had changed hands. Thus, no disposition of the property had occurred. Salomon argued that since neither the first nor the second component of the transaction require recapture, the transaction as a whole did not require it.

Salomon relied on Example 5 of CRR § 1.1502–3(f) ("CRR Example 5") which, it believed, precisely described this case. CRR Example 5 assumes

> [corporations] P, S, and T [which] file a consolidated return for calendar year 1967. In such year S places in service section 38 property having an estimated useful life of more than 8 years. In 1968, P, S, and T file a consolidated return and in such year S sells such property to T.... [Then,] in 1969, P sells all the stock of T to a third party.

The Example concludes that the sale of T's stock to a third party, which Salomon argued was analogous to EMC's distribution of EC stock to its shareholders, "will not cause section 47(a)(1) to apply." Treas. Reg. 1.1502–3(f)(3).

Revenue Ruling 82–20, relied upon by the IRS and the district court, reaches the opposite result. *See* Rev.Rul. 82–20, 1982–1 C.B. 6. This ruling assumes that Parent corporation P owns 100 percent of subsid-

iary corporation S, and the two file a consolidated federal income tax return. A and B, equal owners of P, conflict over the running of the business. They decide to split the business into two independent corporations, one owned by A and the other by B. To achieve this, "P transferred all the assets of one of the businesses necessary to conduct the trade or business, including section 38 property, to S solely in exchange for additional shares in S and immediately thereafter distributed all the stock of S to A.... A surrendered all its stock in P as part of the transaction." *Id.* Revenue Ruling 82–20 holds that

> [w]hen there is no intention at the time of transfer to keep the property within the consolidated group, the transaction should be viewed as a whole and not as separate individual transactions.... Because the transfer [of the section 38 property] from P to S is a step in the planned transfer of the property outside the group, [the exception in] section 1.1502–3(f)(2)(i) of the regulations does not apply [to this transaction]. Therefore, the transfer from P to S is a disposition under section 47(a)(1) of the Code.

*Id.*

In a clear and thoughtful opinion dated February 24, 1992, and amended on February 28, 1992, Judge Freeh found it undisputed that, at the time of asset transfer, EMC already intended to spin-off EC outside the consolidated return group. Rosenthal, he noted, "wanted to separate not just the operations of the Industrial and PB divisions, but the ownership and control as well." Judge Freeh accordingly found that, under Revenue Ruling 82–20, the transaction should be viewed as a whole and that recapture of the tax credits was required. He additionally relied on the step transaction doctrine under which " 'the tax consequences of an interrelated series of transactions are not to be determined by viewing each of them in isolation but by considering them together as component parts of an overall plan.' " *Security Industrial Insurance Co. v. United States,* 702 F.2d 1234, 1244 (5th Cir.1983) (quoting *Crenshaw v. United States,* 450 F.2d 472, 475 (5th Cir.1971) *cert. denied*

408 U.S. 923, 92 S.Ct. 2490, 33 L.Ed.2d 333 (1972)). Judge Freeh held that, under either of these rationales, the transaction must be viewed as a whole that constituted a "disposition" under § 47(a)(1) and recapture was proper. On February 27, 1992, Judge Freeh denied Salomon's motion for summary judgment and granted summary judgment to the government. Salomon appeals.

## DISCUSSION

### I. *Was it Proper for the District Court to Rely on Revenue Ruling 82–20?*

Salomon first contends that the district court erred by relying on Revenue Ruling 82–20 which, it maintains, is not good law. We disagree.

Revenue rulings represent the official IRS position on application of tax law to specific facts. *See* Rev.Rul. 92–1, § 2.05, 1992–1 I.R.B. 7, 12; *Becker v. Commissioner of Internal Revenue,* 751 F.2d 146, 149 (3rd Cir.1985). They relate to matters as to which the IRS is the "primary authority." *Bob Jones Univ. v. United States,* 461 U.S. 574, 596, 103 S.Ct. 2017, 2030, 76 L.Ed.2d 157 (1983). Revenue rulings are accordingly entitled to precedential "weight." *Carle Foundation v. United States,* 611 F.2d 1192, 1195 (7th Cir.1979) *cert. denied* 449 U.S. 824, 101 S.Ct. 85, 66 L.Ed.2d 27 (1980). Indeed, we have stated that "Revenue rulings issued by the I.R.S. are entitled to great deference, and have been said to 'have the force of legal precedent unless unreasonable or inconsistent with the provisions of the Internal Revenue Code.' " *Amato v. Western Union Int'l, Inc.,* 773 F.2d 1402, 1411 (2d Cir.1985) (quoting *Fred H. McGrath & Son, Inc. v. United States,* 549 F.Supp. 491, 493 (S.D.N.Y.1982) (citation omitted)), *cert. dismissed, Western Union Int'l, Inc. v. Amato,* 474 U.S. 1113, 106 S.Ct. 1167, 89 L.Ed.2d 288 (1986); *see also The Progressive Corp. v. United States,* 970 F.2d 188 (6th Cir.1992). We believe that Revenue Ruling 82–20 is neither unreasonable, nor inconsistent with prevailing law.

A. *Revenue Ruling 82–20 is not unreasonable.*

■ Revenue Ruling 82–20 addresses itself to those consolidated group asset transfers that are "immediately" followed by a pre-conceived spin-off of the transferee corporation to a third-party outside the group. It holds, in essence, that such transactions should be treated the same as a direct transfer of the section 38 assets to a third-party. Since the direct transfer constitutes a "disposition" under § 47(a)(1), *see* Treas.Reg. § 1.1502–3(f)(3) ex. 3, it reasons that the more circuitous transfer by way of another consolidated group member should be as well.

We do not find this conclusion unreasonable. In substance, if not in form, the direct and the circuitous transaction are the same. *See Commissioner v. Court Holding Co.,* 324 U.S. 331, 334, 65 S.Ct. 707, 708, 89 L.Ed. 981 (1945). Each achieves a rapid transfer of section 38 property outside the group. To distinguish between them would deny economic reality. *See Gregory v. Helvering,* 293 U.S. 465, 470, 55 S.Ct. 266, 268, 79 L.Ed. 596 (1935) (refusing to "exalt artifice above reality" in determining tax liability). Moreover, such a holding would allow the common parent of a consolidated group, such as EMC, to move section 38 property outside the group without paying recapture taxes simply by first transferring the property to a member subsidiary and then distributing the subsidiary's stock to the third-party. Revenue Ruling 82–20's requirement of recapture under these circumstances is not unreasonable.

B. *Revenue Ruling 82–20 is consistent with prevailing law.*

Salomon next argues that Revenue Ruling 82–20 is inconsistent with prevailing law. Salomon's first assertion, that the rule is squarely at odds with CRR Example 5, is flawed because there is no inconsistency between Revenue Ruling 82–20 and CRR Example. The two rulings address different factual situations. CRR Example 5 assumes that the asset transfer occurs in one year (1968) and the spin-off in the next

(1969). Placing these two steps in different calendar years is not accidental, and signifies a meaningful time delay between them. *But see Walt Disney v. Commissioner,* 97 T.C. 221, 228 (1991). Where such a delay exists, Salomon's argument that the two steps of the transaction should be treated separately for tax purposes makes a good deal of sense. In such circumstances, there is little reason to believe that the transferor corporation intends to use the transaction as a means of moving section 38 property out of the group while avoiding recapture taxes. *See Tandy Corp. v. Commissioner,* 92 T.C. 1165, 1173 (1989) (decision to view separately the two steps of a divisive "D" transaction premised on the "[d]elay of the stock distribution" until the year following the asset transfer).

Revenue Ruling 82–20, however, assumes that the spin-off follows "immediately" after the asset transfer. Rev.Rul. 82–20, 1982–1 C.B. 6, 7. The rapidity with which these components follow one another suggest that they are, in substance, parts of one overall transaction intended to dispose of the section 38 assets outside of the consolidated group. Revenue Ruling 82–20 further solidifies this inference by positing that there is "no intention at the time of transfer to keep the property within the consolidated group." *Id.* These factual circumstances, timing and intent, differ from those presented in CRR Example 5. They lead to the conclusion that the two components are steps in a larger transaction which, when viewed as a whole, constitutes a § 47(a)(1) "disposition." *Cf. Tandy* at 1170 (recapture argument better supported where asset transfer and spin-off occur in same calendar year). The Revenue Ruling thus complements CRR Example 5 by dealing with transactions that occur rapidly and are intended at their onset to transfer section 38 property outside the consolidated group. The consolidated return regulations state that "[t]he Internal Revenue Code, *or other law,* shall be applicable to the group to the extent the regulations do not exclude its application." Treas.Reg. § 1.1502–80 (emphasis added). Revenue Ruling 82–20 is within the ambit

of such "other law." We accordingly believe that the two rulings are not in conflict, and may consistently be read together. Judge Freeh did not err when he viewed the two rulings as alternatives and then chose Revenue Ruling 82–20 based on EMC's intention "immediately" to spin-off EC following the asset transfer.

Revenue Ruling 82–20, in addition to not conflicting with CRR Example 5, is fully consistent with the purpose and express terms of the Code's recapture provisions, 26 U.S.C. § 47 *et seq.* (1976 & Supp.1980). Congress instituted recapture in order "[t]o guard against a quick turnover of assets by those seeking multiple credit." S.Rep. No. 1881, 87th Cong., 2d Sess. 18 (1962), *reprinted in* 1962 U.S.C.C.A.N. 3304, 3320. Asset transfers with the intent of immediately spinning-off the transferee corporation exemplify this concern. As explained above, § 47(a)(1) provides for recapture upon the "disposition" of section 38 property. Section 47(b), however, makes an exception to this rule where the transfer occurs "by reason of a mere change in the form of conducting the trade or business so long as the property is retained in such trade or business as section 38 property *and the taxpayer retains a substantial interest in such trade or business.*" 26 U.S.C. § 47(b) (Supp. IV 1980) (emphasis added). Where the transferor corporation does not retain the necessary "substantial interest" in the transferee, § 47(b) does not apply and recapture is required. *See* Treas.Reg. § 1.47–1(f)(ii)(b). In divisive "D" reorganizations of the type engaged in by EMC, the transferor parent distributes all the shares of the transferee to its shareholders. It does not retain a "substantial interest" in the transferee subsidiary. Salomon maintains Revenue Ruling 82–20's "intent" test violates the "single entity concept" by failing to preserve the integrity of the initial asset transfer from one consolidated group member to another. It argues that Revenue Ruling 82–20 is inconsistent with the Code's consolidated return provisions.

The Code treats consolidated return filers as a single entity principally because it assumes that, contrary to the technicalities of corporate form, they actually function as one unit. Thus, CRR § 1.1502–3(f)(2) holds that there is no § 47(a)(1) "disposition" because it supposes that the transferor corporation is so intertwined with the transferee that it might as well have been moving assets from one branch of its own operation to another.

A pre-existing intent to spin-off the transferee corporation outside of the group, however, changes the picture entirely. Under these circumstances, the transaction is, in substance, a means of moving the assets outside the group. There is much less reason to preserve the fiction that the corporations involved are a "single entity." To the contrary, if the asset transfer and spin-off are not treated the same as any other third-party disposition, consolidated groups will have an incentive to use these transactions as a means of avoiding recapture taxes. We therefore give little weight to the single entity principle in this context and hold that it does not render invalid the IRS' conclusion, voiced in Revenue Ruling 82–20, that "[w]hen there is no intention at the time of transfer to keep the property within the consolidated group, the transaction should be viewed as a whole and not as separate individual transactions" and recapture should be the order of the day. Rev.Rul. 82–20 1982–1 C.B. 6.

In sum, we find Revenue Ruling 82–20 consistent with the Code, and hold that the district court properly relied upon it.

### II. *The district court's alternative holding.*

In addition to Revenue Ruling 82–20, the district court relied independently on the step transaction doctrine pursuant to which it held the asset transfer and spin-off to be a single transaction for tax liability purposes. The court reasoned that, while there might not have been a binding commitment to do the second step, the first step was done with a view towards the end result which was accomplished by the second step and without which the first step would not have occurred. On appeal, the parties dispute whether the step-transaction doctrine applies on the specific facts of

**844**

this case. They cite three conflicting tests for determining where the doctrine is applicable: the "binding commitment" and the "end result" tests alluded to in the district court's opinion, as well as a third, the "interdependence" test. *See generally, Security Industrial Insurance Co. v. United States,* 702 F.2d 1234, 1244–45 (5th Cir. 1983).

Our holding that Revenue Ruling 82–20 controls is sufficient to sustain the district court's ruling. We need not reach the question of whether its alternative ground, the step transaction doctrine, is similarly valid. We therefore leave for another day the question of which, if any, of the three tests should be the rule in this circuit.

Judgment affirmed.