**WALT DISNEY INCORPORATED,**
**Petitioner–Appellee,**

v.

**COMMISSIONER, INTERNAL**
**REVENUE SERVICE,**
**Respondent–Appellant.**

No. 92–70082.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 14, 1993.

Decided Aug. 31, 1993.

---

Frank P. Cihlar, U.S. Dept. of Justice, Tax Div., Washington, DC, for respondent-appellant.

James G. Phillipp, Gibson, Dunn & Crutcher, Los Angeles, CA, for petitioner-appellee.

Before: WOOD, Jr.*, REINHARDT, and RYMER, Circuit Judges.

RYMER, Circuit Judge:

Walt Disney Incorporated ("Disney") brought this action for redetermination of the Commissioner of Internal Revenue's assessment of a $453,197 federal income tax deficiency for Disney's tax year ended January 28, 1982. Pursuant to Rule 91 of the Rules of Practice and Procedure of the United States Tax Court, the facts were stipulated by the parties, and the case was submitted to the Tax Court for decision. Concluding that under the terms of Treas.Reg. §§ 1.1502–3(f)(2) & (3) there was no "disposition" within the meaning of 26 U.S.C. § 47(a)(1) (1976), and thus Disney was not required to "recapture" investment tax credit taken on any of the assets involved in the transaction at issue, the Tax Court held that there was no federal income tax deficiency. *Walt Disney v. Commissioner*, 97 T.C. 221, 1991 WL 145046 (1991). The Commissioner appeals. We have jurisdiction under 26 U.S.C. § 7482, and we reverse.

## I

Retlaw, a California corporation and a predecessor of appellee Walt Disney Incorporated, was formed by Walter E. Disney before

* Honorable Harlington Wood, Jr., Senior United States Circuit Judge for the Seventh Circuit, sitting by designation.

his death.[1]  At all relevant times prior to December 1, 1981, Retlaw's main businesses and assets (exclusive of cash, cash equivalents, and receivables) were the following:

(a) the commercial rights to the name "Walt Disney," licensed by Retlaw to Walt Disney Productions ("Productions") for the latter's use in connection with various business ventures;

(b) two attractions at Disneyland—the miniature railroad and the monorail system;

(c) two television broadcasting stations;

(d) a 14,000 acre cattle ranch;  and

(e) several agricultural properties.

Sometime prior to April 9, 1980, in response to inquiries by Productions, Retlaw and Productions opened negotiations for Productions to acquire from Retlaw the "Walt Disney" name and the miniature railroad and monorail (items (a) and (b), or the "Disney assets").  After more than a year of negotiation, Productions and Retlaw entered into a written contract ("Retlaw Acquisition Agreement") dated July 8, 1981, under which Productions, following the divestiture by Retlaw of all of its properties other than the Disney assets (*i.e.*, items (c)-(e), or the "non-Disney assets"), would acquire all the common stock of Retlaw in exchange for $46.2 million worth of Productions common stock.

The agreed upon exchange of stock was subject to certain conditions precedent specified in the Retlaw Acquisition Agreement, among them:

(1) prior to closing, Retlaw would transfer to a newly-formed, wholly-owned subsidiary ("Flower Street") all of the non-Disney assets.  Retlaw then would distribute the stock of Flower Street pro rata to Retlaw's shareholders;

(2) the Retlaw Acquisition Agreement had to be approved by a vote of Productions' shareholders owning a majority of Productions' common shares voting on the matter (exclusive of the shareholders of Productions who were also shareholders of Retlaw, and certain related persons);  and

(3) there could be no litigation pending or threatened on the closing date against Retlaw or affecting Retlaw's business or assets, nor could there be in effect any court order restraining or enjoining the acquisition.  Productions was given the authority to waive each of the conditions contained in the Retlaw Acquisition Agreement.

Anticipating the closing of the Retlaw Acquisition Agreement, Retlaw and Productions had requested on July 1, 1981 an IRS ruling on the income tax consequences of the proposed transactions.  In its October 22, 1981 ruling, the IRS determined that (1) the exchange of Retlaw's assets for all the stock of Flower Street, followed by the distribution of the Flower Street stock to the Retlaw shareholders (the corporate division) would qualify as a tax-free reorganization within the meaning of section 368(a)(1)(D) of the Internal Revenue Code ("D" reorganization)[2];  and (2) the subsequent exchange of all the Retlaw stock for Productions stock (the corporate acquisition) would be a reorganization within the meaning of section 368(a)(1)(B) ("B" reorganization).  26 U.S.C. § 368(a)(1)(B) & (D) (1976).

On December 1, 1981, Retlaw transferred all of its non-Disney assets to Flower Street in exchange for 4,500 shares of authorized but unissued Flower Street common stock. The non-Disney assets transferred to Flower Street included "section 38 assets"—*i.e.*, tangible personal property upon which Retlaw had previously taken an investment tax credit in accordance with sections 38 and 46 of the Internal Revenue Code.  26 U.S.C. §§ 38, 46 (1976 & Supp. IV 1980).  On the same day, the Retlaw board of directors also authorized the distribution of the Flower Street stock pro rata to the Retlaw shareholders, but specified that the distribution could only be made concurrently with the closing of Productions' proposed acquisition of Retlaw.  Retlaw took no formal action, as

1.  "Retlaw" is "Walter" spelled backwards.

2.  A corporation distributing stock pursuant to a divisive "D" reorganization recognizes neither gain or loss.  26 U.S.C. § 361(a) (1976).  Similarly, the shareholders who receive such stock recognize neither gain nor loss.  26 U.S.C. § 355(a)(1) (1976).

evidenced by shareholder or Board resolution, contemplating the liquidation of Flower Street in the event the acquisition of Retlaw by Productions failed to occur.

On December 18, 1981, Productions commenced the solicitation of proxies in connection with its January 28, 1982 shareholders' meeting. At the scheduled meeting, Productions' shareholders approved the Retlaw Acquisition Agreement by an affirmative vote of 93 percent of the common shares voted. Immediately following the meeting, also on January 28, 1982 and just prior to Productions' acquisition of the stock of Retlaw under the terms set forth in the Retlaw Acquisition Agreement, Retlaw distributed to its own shareholders pro rata all of the outstanding stock of Flower Street, until then owned by Retlaw.

As a result of its acquisition by Productions, Retlaw's taxable year, which had begun on March 29, 1981, ended on January 28, 1982.[3] For that abbreviated taxable year, Retlaw and Flower Street, a member of the "affiliated group" of which Retlaw was the parent corporation, elected to file a consolidated federal income tax return. *See* 26 U.S.C. § 1504(a).[4] The consolidated return included the income and deductions of Retlaw for the period March 29, 1981 through January 28, 1982, and the income and deductions of Flower Street for the period December 1, 1981, through January 28, 1982. In the consolidated return, however, Retlaw failed to recapture the investment tax credits it previously had taken on the section 38 property included among the non-Disney assets transferred to Flower Street. Based on this failure, the IRS determined the deficiency that was the subject of Disney's petition

for redetermination and of the Commissioner's present appeal.

## II

■ The Tax Court's decision of a legal question is reviewed de novo. *Paccar, Inc. v. CIR,* 849 F.2d 393, 396 (9th Cir.1988).

## III

The primary tax question in this case is whether Disney was required to recapture a portion of the investment tax credit it had previously taken with respect to certain of the non-Disney assets transferred by Retlaw to Flower Street on December 1, 1981 during the course of Retlaw's "D" reorganization.[5] The Commissioner argues that the Tax Court's determination that no recapture of investment tax credit was mandated following Retlaw's transfer of section 38 property to Flower Street and the ensuing distribution of Flower Street stock to Retlaw's shareholders is contrary to Revenue Ruling 82–20, which held that recapture was necessary in a hypothetical situation involving a similar "D" reorganization.[6]

Disney counters that Revenue Ruling 82–20 does not apply on the facts of this case and that, in any event, the Commissioner may not use a revenue ruling to limit or otherwise qualify the explicit and unambiguous language of the Commissioner's own regulations. Noting that § 1.1502–3(f)(2)(i) of the Consolidated Return Regulations provides that "a transfer of section 38 property from one member of the [consolidated return] group to another member of such group during a consolidated return year shall not be treated as a disposition or cessation

---

**3.** Prior to January 28, 1982, Retlaw's taxable year was a 52–53 week year ending on the Saturday closest to the last day of March.

**4.** 26 U.S.C. § 1501 *et seq.,* and the Consolidated Return Regulations promulgated thereunder, "permit affiliated corporations ... to be treated as a single entity for income tax purposes as if they were, in fact, one corporation." *Salomon, Inc. v. United States,* 976 F.2d 837, 840 (2nd Cir.1992) (citation omitted).

**5.** During the tax period at issue in this case, the Internal Revenue Code provided an "investment tax credit," reducing the tax liability of taxpayers

who invested in certain business-related machines and equipment known as "section 38 property." 26 U.S.C. §§ 38, 46 (1976 & Supp. IV 1980); *see generally Salomon, Inc.,* 976 F.2d at 839. Section 47(a)(1) required "recapture" of the investment tax credit where the taxpayer "disposed" of the section 38 property before the end of its statutorily defined useful life. 26 U.S.C. § 47(a)(1) (1976); *Salomon, Inc.,* 976 F.2d at 839.

**6.** The Tax Court did not cite Revenue Ruling 82–20 in its opinion.

within the meaning of section 47(a)(1)," Disney asserts that the first component of Retlaw's "D" reorganization—the transfer of the non-Disney assets to Flower Street—was not a disposition pursuant to 47(a)(1) because both corporate entities were members of a single consolidated group. Further, Disney argues that, viewed in isolation, the spin-off of Flower Street to Retlaw's shareholders did not trigger the recapture obligation because the section 38 property remained in the same corporation. Thus, since neither part of Retlaw's "D" reorganization required recapture, Disney maintains that recapture of investment tax credit was not required for the transaction as a whole.

Disney's argument fails; the Commissioner's position is directly supported by the Second Circuit's opinion in *Salomon, Inc. v. United States*, 976 F.2d 837 (2nd Cir.1992) and Revenue Ruling 82–20.

### A

■ Under the facts assumed by Revenue Ruling 82–20, P corporation owns 100 percent of subsidiary corporation S. Rev.Rul. 82–20, (available on WESTLAW, FTX–ALL Database), 1982 IRB LEXIS 318, *1. P and S file a consolidated federal income tax return on a calendar year basis. *Id.* A and B, equal owners of P, decide to split the business into two independent corporations, one owned by A and the other by B. *Id.* at *1–*2. To achieve this end, "P transferred all the assets of one of the businesses necessary to conduct the trade or business, including section 38 property, to S solely in exchange for additional shares in S and immediately thereafter distributed all of the stock of S to A. . . . A surrendered all its stock in P as part of the transaction." *Id.* at *2. The division of P qualified as a "D" reorganization. *Id.* Revenue Ruling 82–20 holds that:

[w]hen there is no intention at the time of transfer to keep the property within the consolidated group, the transaction should be viewed as a whole and not as separate individual transactions. . . . Because the transfer [of the section 38 property] from P to S is a step in the planned transfer of the property outside the group, [the exception in] section 1.1502–3(f)(2)(i) of the regu-

lations does not apply [to this transaction]. . . . Therefore, the transfer from P to S is a disposition under section 47(a)(1) of the Code.

*Id.* at *5–*6.

The reasoning upon which Revenue Ruling 82–20 is based was adopted and further refined by *Salomon, Inc.* In *Salomon, Inc.*, Engelhard Minerals and Chemicals Corporation ("EMC") decided to separate its marketing and industrial divisions into two independent companies. 976 F.2d at 838. EMC transferred the assets and liabilities of its industrial division to an existing wholly owned subsidiary, later renamed Engelhard Corporation ("EC"), and received EC stock in exchange. *Id.* at 838–39. Four days later, EMC "spun-off" EC by distributing its EC stock pro-rata to each EMC shareholder. *Id.* at 839. The IRS ruled that together the asset transfer and spin-off qualified as a divisive "D" reorganization. *Id.* However, as certain of the machinery, equipment, and other assets that EMC transferred to EC was section 38 property, the IRS viewed the transfer as a "disposition" which triggered the § 47(a) recapture requirement. *Id.* at 840. Salomon, Inc., as successor in interest to EMC, brought suit in federal district court to recover the taxes paid as a result of recapture. *Id.* After concluding that Revenue Ruling 82–20 was both reasonable and consistent with the Internal Revenue Code, the Second Circuit affirmed the district court's determination that based on Revenue Ruling 82–20, EMC's "D" reorganization effected a disposition within the meaning of section 47(a)(1), and thus Salomon, Inc. was properly required to recapture investment tax credit previously taken on section 38 property transferred to EC during the transaction. *Id.* at 841–43.

Disney's contention that Revenue Ruling 82–20 does not apply to its "spin-off" of Flower Street stock centers on the fact that in the ruling, the corporate taxpayer, who had first transferred certain section 38 property to a newly formed subsidiary in furtherance of the spin-off, proceeded "immediately thereafter" to distribute the stock of the

subsidiary to its own shareholders.[7] Disney posits that the "D" reorganization detailed in Revenue Ruling 82–20 involved no intervening conditions or contingencies of any kind, and that the distribution was inevitable from the moment those assets were transferred. Disney notes that in the present case, by contrast, there was a 59–day period between the transfer by Retlaw of its non-Disney assets to Flower Street and the distribution of the Flower Street stock to the Retlaw shareholders. Disney contends that during this 59–day interval, Flower Street maintained an independent, self-sufficient corporate existence—generating revenue, and actively engaging in the ownership and operation of two television stations, a 14,000 acre cattle ranch, and a number of agricultural properties. Disney emphasizes that whether the second step of its "D" reorganization would occur was highly uncertain; at least two potentially troublesome conditions precedent required satisfaction in order to enable Retlaw to complete the spin-off. Thus, in Disney's view, the transfer by Retlaw of its assets to Flower Street and the distribution of the Flower Street shares were actually two separate and distinct transactions which, in combination, added up to a divisive "D" reorganization.

Disney's attempt to distinguish Revenue Ruling 82–20 fails. That there were numerous conditions and contingencies which could have prevented the completion of the reorganization is irrelevant; as the Commissioner asserts, the point is that the transaction was in fact closed as planned, and that Retlaw was contractually obligated under the Retlaw Acquisition Agreement (1) to transfer the non-Disney assets to Flower Street and (2) to distribute the Flower Street stock to its shareholders. Retlaw's undisputed legal obligation—regardless of its conditional nature—is compelling evidence of the absence of Retlaw's intent "at the time of transfer to keep the property within the consolidated group." Rev.Rul. 82–20, 1982 IRB LEXIS 318, at *5. While the "pre-conceived spin-off" of Flower Street arguably did not "immediately" follow the consolidated group asset transfer which took place 59 days earlier, the time interval separating the two steps of a "D" reorganization is a proxy for the determination of whether the transferor initially possessed an intent to transfer the section 38 assets to a third party outside the consolidated group. *See Salomon, Inc.,* 976 F.2d at 842 ("Revenue Ruling 82–20 ... assumes that the spin-off follows 'immediately' after the asset transfer. The rapidity with which these components follow one another suggest[s] that they are, in substance, parts of one overall transaction intended to dispose of the section 38 assets outside of the consolidated group.") (citation omitted). Thus, where as here, such intent is manifest by the terms of a contractual obligation, the spin-off of Flower Street, effected 59 days after the asset transfer was completed, was sufficiently proximate.[8]

### B

Disney next argues that Revenue Ruling 82–20 is unreasonable and inconsistent with existing law.[9] *See Salomon, Inc.,* 976 F.2d at 841 ("Revenue rulings issued by the I.R.S. are entitled to great deference, and have been said to have the force of legal precedent unless unreasonable or inconsistent with the provisions of the Internal Revenue Code.") (citations omitted). Specifically, Disney maintains that the exception to section 1.1502–3(f)(2) of the Consolidated Return Regulations for tax-free, divisive reorganizations, carved out by Revenue Ruling 82–20, is inconsistent with any fair reading of the reg-

---

7. Disney does not dispute that IRS Revenue Rulings are entitled to deference if reasonable and consistent with the provisions of the Internal Revenue Code. Disney's initial argument is simply that the facts assumed by Revenue Ruling 82–80 are "readily distinguishable" from the facts of the present case.

8. At argument, Disney stressed both that its "D" reorganization was a legitimate, "non-sham" transaction, and that Flower Street was a viable corporate entity for nearly two months. However, Disney offered no cogent explanation as to how these facts are significant here in light of the intent-based inquiry set forth in Revenue Ruling 82–20 and *Salomon, Inc.*

9. While Disney does not use these exact terms, its argument attacking the legal validity of Revenue Ruling 82–20 asserts the substantial equivalent.

ulation. Disney claims that section 1.1502–3(f)(2) is unambiguous and needs no interpretation or construction by way of a revenue ruling or otherwise.[10] Further, Disney asserts that illustrative Example 5 of § 1.1502–3(f), which concludes that the recapture requirement contained in section 47(a)(1) does not apply under its assumed facts,[11] precisely describes this case.

The same argument was rejected by *Salomon, Inc.*, 976 F.2d at 841–43. *Salomon, Inc.* noted that Revenue Ruling 82–20 holds that "consolidated group asset transfers that are 'immediately' followed by a pre-conceived spin-off of the transferee corporation to a third party outside the group" "should be treated the same as a direct transfer of section 38 assets to a third party." *Id.* at 842. We agree that Revenue Ruling 82–20 is not unreasonable because "[i]n substance, if not in form, the direct and the circuitous transaction are the same" and "to distinguish between them would deny economic reality" and would allow the common parent of a consolidated group to circumvent easily the recapture requirement. *Id.* Moreover, Revenue Ruling 82–20 and Example 5 of the Consolidated Return Regulations are not inconsistent because they address different situations: the latter covers situations where, due to a "meaningful time delay" between the asset transfer and the spin-off, there is "little reason to believe that the transferor corporation intends to use the transaction as a means of moving section 38 property out of the group while avoiding recapture taxes"; the former involves facts under which the transferor's initial intent to move section 38

property out of the consolidated group is undisputed. *Id.*

Along with the Second Circuit, we conclude that Revenue Ruling 82–20 is neither unreasonable nor inconsistent with Example 5 or any other provision of the Internal Revenue Code and its accompanying regulations.

## IV

■ Last, Disney argues that even if Revenue Ruling 82–20 were valid, and the exemption from recapture contained in section 1.1502–3(f)(2) of the Consolidated Return Regulations were not available, there still would be no tax deficiency. More specifically, Disney maintains that the Tax Court reached the correct result because pursuant to Treas.Reg. § 1.47–3(f)(5)(ii), if Disney had liability for investment tax credit recapture, that liability arose on January 28, 1982, the date Retlaw distributed the Flower Street stock to its shareholders, and not December 1, 1981, the date the non-Disney assets were distributed by Retlaw to Flower Street. According to Disney, there is no evidence in the record of what the amount of investment tax credit recapture would have been as of January 28, 1982. Moreover, Disney asserts that there is no evidence that, on January 28, 1982, any of the section 38 property included among the non-Disney assets transferred to Flower Street two months earlier was still subject to investment tax credit recapture at all.

Disney's argument is without merit. The Commissioner determined that "you [Retlaw] are subject to recapture the investment tax credit in the amount of $524,858 in lieu of the

10. Relying on *Henry C. Beck Builders, Inc. v. Commissioner*, 41 T.C. 616, 1964 WL 1286 (1964) and several decisions which have followed, Disney asserts that "[i]n any case where a taxpayer files a valid, consolidated return, the consolidated-return regulations apply strictly in accordance with their terms. There are no exceptions or exclusions other than those for which the Commissioner has made specific provision in the regulations themselves, initially or by way of subsequent amendment." However, as *Salomon, Inc.* notes, the consolidated return regulations state that "[t]he Internal Revenue Code, *or other law,* shall be applicable to the group to the extent the regulations do not exclude its application. Treas.Reg. § 1.1502–80 (emphasis add-

ed)." 976 F.2d at 842. We agree with the Second Circuit's conclusion that "Revenue Ruling 82–20 is within the ambit of such 'other law.'" *Id.* at 842–43.

11. Example 5 of Consolidated Revenue Ruling § 1.1502–3(f) assumes:

[Corporations] P, S, and T [which] file a consolidated return for calendar year 1967. In such year S places in service section 38 property having an estimated useful life of more than 8 years. In 1968, P, S, and T file a consolidated return and in such year S sells such property to T.... [Then,] in 1969, P sells all the stock of T to a third party.

$40,940 reported by you in your return for the taxable year ended January 28, 1982. The adjustment of $483,918 results from an early disposition of Section 38 property in conjunction with your corporate reorganization." The Commissioner's deficiency determination is presumed to be correct, and Disney has the burden of proving error. *Edelson v. CIR*, 829 F.2d 828, 831 (9th Cir.1987). While relying on *Tandy Corp. v. Commissioner*, 92 T.C. 1165, 1989 WL 56149 (1989) and Treas.Reg. § 1.47–3(f)(5)(ii), Disney challenges the timing and mechanics of the Commissioner's computation, Disney offered no evidence that the Commissioner's statutory notice of deficiency was incorrect, or that a different result would have been reached had the computation been made as of January 28, 1982. The absence of record evidence with respect to the proper amount of Disney's tax deficiency mandates affirmance of the Commissioner's deficiency determination.

**REVERSED.**