23 F.3d 36
 73 A.F.T.R.2d 94-1799, 73 A.F.T.R.2d 94-2374
 George J. GILLESPIE, III; Morgan Guaranty Trust Company of
New York, as Executors of the Last Will and Testament of
Eugene Meyer III and as Trustees of the Trust for the
Benefit of Eugene Meyer III under agreement dated January
16, 1956, as amended, Plaintiffs-Appellants,
v.
UNITED STATES of America, Defendant-Appellee.
 No. 676, Docket 93-6171.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 1, 1993.
Decided April 13, 1994.
 
 John E. Beerbower, New York City (Cravath, Swaine & Moore, on the brief), for plaintiffs-appellants.
 Robert W. Sadowski, Asst. U.S. Atty., New York City (Mary Jo White, U.S. Atty., S.D.N.Y., Ping C. Moy, Asst. U.S. Atty., on the brief), for defendant-appellee.
 Before KEARSE and JACOBS, Circuit Judges, and CARTER, District Judge*.
 KEARSE, Circuit Judge:
 
 
 1
 Plaintiffs George J. Gillespie, III, and Morgan Guaranty Trust Company of New York ("Morgan"), executors of an estate, appeal from so much of a judgment of the United States District Court for the Southern District of New York, entered after a bench trial before Gerard L. Goettel, Judge, as granted them a refund of assessed federal estate taxes and interest in the amount of only $1,088,524, rather than the requested amount of $1,510,094.67, in connection with the valuation of a large block of stock owned by the estate. The district court, though partly upholding plaintiffs' claim in other respects, ruled that in valuing a large block of stock an estate may not properly calculate its fair market value by deducting, from the price the ultimate purchaser would pay, the estimated underwriting fees and other expenses that would be incurred in a hypothetical secondary offering. Plaintiffs contend that this ruling was error. We disagree and affirm the judgment of the district court.
 
 I. BACKGROUND
 A. The Estate
 
 2
 The facts, which were largely stipulated in the district court, can be stated briefly. Gillespie and Morgan are executors of the estate of Eugene Meyer, III (the "Estate"). At the time of his death, Meyer was a member of the board of directors of the Washington Post Company ("WPC"), the publisher of several newspapers and magazines including The Washington Post and Newsweek. Meyer's gross estate included 743,500 shares of the Class B common stock of WPC. Because these shares constituted approximately 6.54% of the 11,370,218 shares of WPC Class B common stock then outstanding, the Estate was an "issuer" of that class of stock within the meaning of Sec. 2(4) of the Securities Act of 1933 (the "Act"), 15 U.S.C. Sec. 77b(4) (1988), and was an "affiliate" of WPC within the meaning of Rule 144(a)(1) promulgated under the Act ("Rule 144"), 17 C.F.R. Sec. 230.144(a)(1). Accordingly, federal law limited the methods by which the bulk of the Estate's WPC shares could be sold.
 
 
 3
 On February 24, 1982, the date of Meyer's death, the mean trading price of a share of WPC stock on the American Stock Exchange was $28.375. Thereafter, the price of the stock rose, and in May and June of 1982, the Estate disposed of a total of 211,000 WPC shares pursuant to Rule 144, which exempts the sale of a limited number of shares from the Act's registration requirement, see 15 U.S.C. Sec. 77e (1988), at prices ranging between $34 and $35 per share. Plaintiffs determined that in light of the size of the remaining block of shares and the legal restrictions, the disposition method that would maximize the value of those shares to the Estate would be an underwritten secondary offering. Accordingly, on July 9, 1982, the Estate sold an additional 422,500 shares pursuant to a registered underwritten secondary offering (the "July 1982 offering"). The proceeds received by the Estate from its underwriter, Salomon Brothers Inc. ("Salomon"), totaled $14,365,000, or $34 per share. In connection with this offering, the Estate incurred expenses of $213,142, which included, inter alia, accounting fees, legal fees, printing fees, and registration fees, but did not include underwriting fees. Plaintiffs and Salomon agreed that, as an underwriting fee for the transaction, Salomon would be allowed to retain possession of the proceeds of the sale of the 422,500 shares until the 90th day following the sale and would make no payment to the Estate for the use of those funds during the 90-day period.
 
 
 4
 In seeking to place a value on the Estate's original 743,500 WPC shares for tax purposes, plaintiffs sought the opinion of Salomon as to the price, expense, and yield that could have been realized in a secondary offering immediately after Meyer's death (the "hypothetical offering"). In an opinion dated November 22, 1982, Salomon concluded that the hypothetical offering would have yielded $25.3725 per share to the Estate. It arrived at that figure by starting with the $28.375-per-share mean open-market trading price of WPC stock on the date of Meyer's death, and deducting (a) $1.375 per share as the projected price depression that would have resulted from the announced sale of so large a block of stock (the "blockage discount"), (b) $1.1475 per share as the amount that an underwriter would have demanded as compensation for selling the shares (the "underwriter fees"), and (c) $0.48 per share as the other expenses that would have been incurred by the Estate in connection with the registration of such an offering (the "other expenses").
 
 
 5
 Relying on these calculations, plaintiffs used the $25.3725-per-share figure in their valuation of the WPC shares on the Estate's federal estate tax return. The Estate also claimed $213,142, representing the expenses incurred in the July 1982 offering, in deductions as administration expenses pursuant to 26 U.S.C. Sec. 2053(a)(2) (1988). The Estate did not claim a deduction for underwriting fees in connection with that offering.
 
 
 6
 B. The Tax Assessment and Plaintiffs' Claim for a Refund
 
 
 7
 In November 1985, the Internal Revenue Service ("IRS") issued a notice of deficiency based on, inter alia, its view that all of the WPC stock held by the Estate should have been valued at $28.375 per share rather than $25.3725 per share. Accordingly, in April 1986, the IRS assessed a federal estate tax deficiency of $1,095,598.87, plus accrued interest of $557,857.74.
 
 
 8
 After paying the assessment and unsuccessfully filing an administrative claim for a refund, plaintiffs commenced the present action in the district court. To the extent pertinent to this appeal, the complaint sought a refund of estate taxes and assessed interest and penalties totaling $1,510,094.67.
 
 
 9
 Following an extensive stipulation of facts and a bench trial, the district court ruled in favor of plaintiffs in part and in favor of the IRS in part. The court agreed with plaintiffs that, because of the size of the block of shares, the market price of the WPC stock on the day of Meyer's death was not an accurate indicator of the fair market value of the block of WPC stock; and it agreed that a hypothetical offering, with a blockage discount, was an appropriate method for determining the fair market value of the shares. It rejected, however, plaintiffs' contention that the Estate should have been allowed to calculate the fair market value of the shares by deducting from the price paid by the purchaser any underwriting expenses and registration fees that would have been incurred in the hypothetical offering. Noting that 26 U.S.C. Sec. 2053(a)(2) provides for a deduction of administration expenses incurred in selling the property of an estate if the sale is necessary, the court concluded that, "[t]o the extent that an estate has incurred deductible expenses for underwriting fees, the fees are deductible as administrative expenses, but they are not to be considered in determining a discount to be accorded in valuing the stock." (Hearing Transcript, Nov. 17, 1992, at 293.) The court noted that, though the rule could be inequitable in some cases, it had been "consistently applied in the Internal Revenue Code and regulations." (Id.) Accordingly, the court found that the fair market value of the WPC stock, after a blockage discount, but without any deduction for underwriting fees or other expenses, was $27.125 per share.
 
 
 10
 The court therefore entered a judgment which, in pertinent part, granted plaintiffs' estate tax refund claim only to the extent of $717,013 assessed tax, plus $371,511 assessed interest, totaling $1,088,524.
 
 II. DISCUSSION
 
 11
 Plaintiffs contend that the district court erred in upholding the IRS's rejection of the Estate's deduction of underwriting fees and other expenses, which would have been incurred in the hypothetical secondary offering, from the price of the WPC stock in calculating its fair market value. For the reasons below, we disagree.
 
 A. The Statutes and Regulations
 
 12
 The relevant statutory framework governing federal estate taxes is relatively straightforward. Section 2001 of the Internal Revenue Code ("Code") imposes a tax "on the transfer of the taxable estate of every decedent who is a citizen ... of the United States." 26 U.S.C. Sec. 2001(a) (1988). The value of the taxable estate is determined by taking a series of deductions, including a deduction for certain allowable "administration expenses," from the decedent's gross estate. 26 U.S.C. Sec. 2053(a)(2). The value of the gross estate includes "the value at the time of [the decedent's] death of all property, real or personal, tangible or intangible, wherever situated." 26 U.S.C. Sec. 2031(a) (1988).
 
 
 13
 The IRS has issued Treasury regulations to guide the computation of the value of the gross estate when the estate includes marketable securities such as stock or bonds. In general, "[t]he value of stocks and bonds is the fair market value per share or bond on the applicable valuation date." 26 C.F.R. Sec. 20.2031-2(a). "[I]f there is a market for stocks or bonds, ... the mean between the highest and lowest quoted selling prices on the valuation date is the fair market value per share or bond." 26 C.F.R. Sec. 20.2031-2(b)(1). However, "[i]f the executor can show that the block of stock to be valued is so large in relation to the actual sales on the existing market that it could not be liquidated in a reasonable time without depressing the market, the price at which the block could be sold as such outside the usual market, as through an underwriter, may be a more accurate indication of value than market quotations." 26 C.F.R. Sec. 20.2031-2(e). See generally Groff v. Munford, 150 F.2d 825, 827 (2d Cir.1945); Bull v. Smith, 119 F.2d 490, 492 (2d Cir.1941). The regulations do not specify whether, in the calculation of the fair market value of a large block of stock, the "price at which the block could be sold ... through an underwriter" should be reduced by the amount of the underwriting fees and other sales expenses.
 
 B. Revenue Ruling 83-30
 
 14
 Although there is no dispositive Treasury regulation, in 1983 the IRS issued a pertinent revenue ruling. In Revenue Ruling 83-30 (the "1983 Ruling"), the IRS ruled that, in determining the value of a block of stock too large to be sold on the open market without depressing the price, "the relevant figure is the price that the public would pay to the underwriter for the stock, and not the price that the underwriter would pay to the estate. Accordingly, underwriting fees should not be considered in determining the blockage discount." Rev.Rul. 83-30, 1983-1 C.B. 224, 225 (1983). The 1983 Ruling went on to hold that "[u]nderwriting fees, necessarily incurred in marketing a large block of stock are deductible as an administration expense under section 2053(a)(2) of the Code, and are not considered in determining the blockage discount to be accorded in valuing the stock under section 2031." Rev.Rul. 83-30, 1983-1 C.B. at 225.
 
 
 15
 A revenue ruling "represent[s] the official IRS position on application of tax law to specific facts.... Revenue rulings issued by the I.R.S. are entitled to great deference, and have been said to have the force of legal precedent unless unreasonable or inconsistent with the provisions of the Internal Revenue Code." Salomon, Inc. v. United States, 976 F.2d 837, 841 (2d Cir.1992) (internal quotes omitted); Amato v. Western Union International, Inc., 773 F.2d 1402, 1411 (2d Cir.1985), cert. dismissed, 474 U.S. 1113, 106 S.Ct. 1167, 89 L.Ed.2d 288 (1986). We cannot conclude that the position articulated by the IRS in the 1983 Ruling is either unreasonable or inconsistent with any provision of the Code.
 
 
 16
 Fair market value is commonly defined as "the price at which the property would change hands between a willing buyer and a willing seller." United States v. Cartwright, 411 U.S. 546, 551, 93 S.Ct. 1713, 1716, 36 L.Ed.2d 528 (1973). In general, when the property is sold through the services of a broker, the brokerage fees are treated as administration expenses rather than as a subtraction from price that lowers the property's fair market value. See, e.g., id. at 553, 93 S.Ct. at 1717 ("ordinary corporate stock is valued at its fair market price without taking into account the brokerage commission"); Estate of Smith v. Commissioner, 57 T.C. 650, 659, 1972 WL 2557 (1972) (price is amount purchaser would pay exclusive of selling expenses), aff'd on other grounds, 510 F.2d 479 (2d Cir.), cert. denied, 423 U.S. 827, 96 S.Ct. 44, 46 L.Ed.2d 44 (1975); B. Bittker & L. Lokken, 5 Federal Taxation of Income, Estates and Gifts p 135.3.2, at 135-29 (2d ed. 1993) ("brokers' commissions ... may be deductible for income or estate tax purposes, but they do not reduce the property's fair market value"). Cf. Publicker v. Commissioner, 206 F.2d 250, 256 (3d Cir.1953) (rejecting argument that excise tax on a piece of jewelry should be included in the valuation of that jewelry, lest "each time a diamond is sold at retail it acquires as an additional value the amount of the excise tax paid by the seller"), cert. denied, 346 U.S. 924, 74 S.Ct. 312, 98 L.Ed. 418 (1954).
 
 
 17
 The 1983 Ruling treats the underwriter in a secondary offering as, in effect, a broker. Such a characterization is consistent with the treatment accorded underwriters by courts. See, e.g., Estate of Joslyn, 566 F.2d 677, 679 (9th Cir.1977) ("underwriter's charge ... is in substance the charge ... made to sell the ... shares and, as we understand it, no different than the charge which a real estate broker might make for selling a house"). As is true with other sales involving brokers, the 1983 Ruling simply requires the fair market value of the product to be calculated without regard to any brokerage fees incurred.
 
 
 18
 Further, the interpretation given by the 1983 Ruling was designed to prevent the anomaly of permitting an estate to take a double deduction. The Code expressly allows an estate to deduct expenses such as underwriting fees as part of the cost of estate administration. 26 U.S.C. Sec. 2053(a)(2). In some cases, though none directly addressing the role of underwriting fees in the determination of fair market value of stock for purposes of calculating the value of the gross estate, the courts have ruled that this provision permits such a deduction notwithstanding the specter of a possible double deduction. See, e.g., Estate of Jenner v. Commissioner, 577 F.2d 1100, 1104-05 (7th Cir.1978) (fear of "double deduction" could not counteract the plain language of 28 U.S.C. Sec. 2053 and deprive an estate of its right to deduct administration expenses such as underwriting fees); Estate of Joslyn, 566 F.2d at 678-79; In re Estate of Joslyn, 500 F.2d 382, 385-87 (9th Cir.1974). Thus, if an estate were allowed both (a) to deduct underwriting fees and other expenses from its initial hypothetical valuation of the stock in calculating the value of the gross estate, and (b) to deduct from the value of the gross estate the actual underwriting fees and expenses as administration expenses pursuant to Sec. 2053(a)(2) in calculating the value of the taxable estate, the estate would receive an unwarranted double benefit. The 1983 Ruling's elimination of the possibility of such a double deduction is hardly unreasonable. Plainly, the IRS was not required to seek to eliminate that possibility by ruling that the deduction expressly provided for by Sec. 2053(a)(2) could not be taken, for such a course would have been inconsistent with the Code.
 
 
 19
 Nor is the 1983 Ruling inconsistent with any other provision of the Code or the Treasury regulations. As noted above, there is no provision of the Code or the regulations that is directly on point. Moreover, the existing Treasury regulations lend some support to the position advanced in the 1983 Ruling. Regulation 20.2031-2(e) provides that a large block of stock may, in appropriate circumstances, be valued at "the price at which the block could be sold as such outside the usual market, as through an underwriter." As the 1983 Ruling notes, the use of the preposition "through" rather than "to" suggests that the role played by the underwriter is that of conduit to the pertinent purchaser, like the role of any other broker. See Rev.Rul. 83-30, 1983-1 C.B. at 225. Accordingly, the approach taken by the 1983 Ruling, essentially treating underwriting fees as brokerage commissions and prohibiting consideration of those fees in calculating the fair market value of the block of stock, is consistent with Code provisions and Treasury regulations.
 
 
 20
 Plaintiffs' attempt to distinguish the 1983 Ruling on the ground that it dealt with an actual offering, rather than a hypothetical offering, is unpersuasive. While it is true that the 1983 Ruling involved an actual sale, the reasoning that underlies the Ruling is not so limited. The 1983 Ruling clearly indicates that the IRS considers underwriters to be brokers, and requires that they be treated as such for estate tax purposes. That characterization is dispositive of the case at hand.
 
 
 21
 Nor are we persuaded by the contention that, because no deduction for underwriting fees was in fact taken here, it is inequitable to apply the "double deduction" rationale incorporated in the 1983 Ruling to the present case. In formulating a reasonable and generally applicable approach to estate valuation, the IRS is not required to tailor its rules according to the actions taken by individual taxpayers. Its adoption and consistent application of a reasonable general approach to estate valuation should be upheld even though the motivations that prompted adoption of that approach may not apply to each and every taxpayer.
 
 
 22
 Finally, plaintiffs contend that, even if the 1983 Ruling is controlling, it deals by its terms only with the underwriting fees, and not with the other fees associated with the offering. However, we see no principled way to distinguish the underwriting fees from the other sale-related fees such as legal fees and printing fees. Indeed, since the Estate attempted to obtain a double deduction for these other expenses, by first excluding the estimated amount in calculating the value of the gross estate and then claiming an administration deduction from the value of the gross estate for the actual expenses of the July 1982 offering, the reasoning behind the 1983 Ruling applies here with equal or more force to these expenses.
 
 
 23
 In sum, we conclude that Revenue Ruling 83-30, which held that underwriting fees incurred in a secondary offering of a large block of stock should be excluded from the calculation of the fair market value of the stock for the purposes of computing the value of the gross estate, is neither unreasonable nor contrary to any statutory or regulatory provision.
 
 
 24
 The district court found, and no one disputes, that buyers would have been willing and able to pay for the Estate's WPC shares $27.125 per share, that is, the market price less the blockage discount. The court properly declined to allow a further deduction for hypothetical underwriting fees and other sale-related expenses in arriving at the fair market value of the stock.
 
 CONCLUSION
 
 25
 We have considered all of plaintiffs' arguments on this appeal and have found them to be without merit. The judgment of the district court is affirmed.
 
 
 
 *
 Honorable Robert L. Carter, of the United States District Court for the Southern District of New York, sitting by designation